SPRINGS MILLS, INC., Plaintiff,

v.

CONSUMER PRODUCT SAFETY COM-
MISSION, S. John Byington, R. David
Pittle, Barbara Franklin, Lawrence M.
Kushner, Thaddeus Garrett, Richard E.
Rapps, Defendants,

and

Environmental Defense Fund,
Defendant-Intervenor.

Civ. A. No. 77–891.

United States District Court,
D. South Carolina,
Rock Hill Division.

June 23, 1977.

Wesley M. Walker, Mark Holmes, Leatherwood, Walker, Todd & Mann, Greenville, S. C., Emmet J. Bondurant, II, Kilpatrick, Cody, Rogers, McClatchey & Regenstein, Atlanta, Ga., for plaintiff.

Thomas E. Lydon, Jr., U. S. Atty., Columbia, S. C., James D. McCoy, III, Asst. U. S. Atty., Greenville, S. C., Arthur E. Korkosz, Atty., Consumer Affairs Section, Antitrust Division, U. S. Dept. of Justice, Washington, D. C., of counsel; Theodore J. Garrish, Gen. Counsel, Alan Shakin, D. Stephen Lemberg, Consumer Product Safety Commission, Washington, D. C., for defendants.

Robert J. Rauch, William Butler, Washington, D. C., Herbert Buhl (local counsel), Columbia, S. C., for defendant-intervenor.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

CHAPMAN, District Judge.

This matter was tried before the Court on June 13, 1977, as to the first cause of action in the complaint brought by plaintiff Springs Mills, Inc. against Consumer Product Safety Commission, the members of the Commission and the Director for Compliance and Enforcement of said Commission.

Springs seeks a permanent injunction restraining Consumer Product Safety Commission (CPSC) from enforcing or attempting to enforce its regulations relating to TRIS, a flame retardant used primarily in children's sleepwear, technically known as (2, 3 Dibromoprotyl) phosphate. CPSC has issued regulations finding TRIS to be a "banned hazardous substance" within the meaning of 15 U.S.C. § 1261(q)(1)(A), which is the Federal Hazardous Substances Act, 15 U.S.C. §§ 1261–74. The regulations issued by CPSC were published in the Federal Register on April 8, April 20, April 26, May 5 and June 1, 1977. (See 42 Fed.Reg. 18850, 2479, 21274, 22878 and 28060.) These regulations declare that all fabrics, yarns and fibers containing TRIS, and all garments made from such fabrics, yarns and fibers intended for use in manufactured children's wearing apparel are "banned hazardous substances".

By declaring these articles to be "banned hazardous substances", the provisions of 15 U.S.C. § 1274 requiring the repurchase thereof came into effect.

On May 24, 1977, this Court after a hearing in Greenville, South Carolina, issued a preliminary injunction against the CPSC and its Commissioners preventing them from attempting to enforce against Springs any of the TRIS regulations issued by defendants. Subsequent thereto Environmental Defense Fund, Inc. (EDF) moved the Court to intervene as a party defendant in this action. This motion was granted on June 9 with the understanding that EDF would be present at the trial scheduled for June 13 and would make no effort to delay such trial because of its late entry into litigation.

The complaint sets forth four causes of action, but in the interest of time, and since all parties felt that the first cause of action might be dispositive of the case, the trial held on June 13, 1977 involved only such first cause of action, which alleges that the actions of the Commission in adopting the TRIS regulations are unconstitutional, null and void because they are allegedly in violation of the plaintiff's right to procedural and substantive due process of law as guaranteed by the 5th amendment to the Constitution of the United States.

This issue was tried before the Court without a jury and the evidence received consisted of various affidavits, correspondence, reports, transcripts of Commission meetings and stipulations, but no witnesses testified at the trial.

After consideration of the evidence presented and a study of the legal issues the Court, pursuant to Rule 52 of the Federal Rules of Civil Procedure, makes the following

## FINDINGS OF FACT

1. The plaintiff, Springs Mills, Inc., is a corporation organized and existing under the laws of the State of South Carolina and is engaged in the business of spinning, weaving, knitting, refinishing and marketing a large variety of textile products, which until mid 1976 included fabrics treated with a chemical flame retardant known as TRIS.

2. The defendants are the United States Consumer Products Safety Commission, the Chairman and Commissioners thereof, the Executive Director for Compliance and Enforcement of said Commission and Environmental Defense Fund, Inc., which was allowed to intervene as a party defendant in the case.

3. In 1953 Congress enacted the Flammable Fabrics Act, 15 U.S.C. § 1191 et seq. covering the standard for measuring flammability of wearing apparel. Thereafter the Secretary of Commerce was granted authority by the Congress to issue mandatory flammability standards and in 1971 the Secretary issued his apparel flammability standard FF–3–71 (16 C.F.R. § 1615) prohibiting the sale in interstate commerce of all children's sleepwear sizes 0 to 6X that fail to comply with certain flammability standards. In order to comply with this standard it was necessary that this size children's sleepwear be treated with a chemical flame retardant, and TRIS was the only flame retardant available to

effectively treat polyester, acetate and tri-acetate fabrics used for children's sleep-wear, which would enable the sleepwear to comply with the Secretary's standards. This had the practical effect of the Federal Government ordering that TRIS be used. Now another department of the same Government has not only banned TRIS, but ordered the repurchase of articles containing it.

4. On or about March 24, 1976, CPSC received from EDF a petition to require labeling of TRIS treated sleepwear directing that it be washed three times before wearing. CPSC did not publish the contents of this petition, or any proposed regulation suggested thereunder, and took no official action thereon. However, CPSC solicited information from certain selected sources, including EDF itself. In October 1976, EDF complained of the Commission's lack of action on its March 24 petition and CPSC responded in a letter dated December 16, 1976, which stated in part:

"We agree that section 701(e) of the Federal Food, Drug and Cosmetic Act (21 U.S.C. § 371(e)) applies to your petition (See also an applicable regulation at 16 C.F.R. 1500.201(a))."

Nothing was done by CPSC to notify interested parties of the petition or to set a hearing or otherwise allow interested parties the opportunity to present their views thereon as set forth in 21 U.S.C. § 371(e).

5. On February 8, 1977, EDF filed an additional petition with CPSC seeking a ban on the sale of all wearing apparel containing TRIS, and CPSC failed to publish this petition and failed to afford interested persons an opportunity to comment, but continued to receive data from selected sources such as EDF, NCI and certain doctors and professors. All of these contacts represent ex parte communications with the Commission at a time when it had petitions pending.

6. On February 4, 1977, officials of CPSC and NCI held a meeting to review the data and findings of NCI. Notice of this meeting was not given to Springs or anyone else who might be affected by the information obtained from NCI. The minutes of this meeting show the data supplied by NCI was unverified, uninterpreted and uncertain.

7. The Commission thereafter had meetings with EDF personnel, including Robert J. Rauch, counsel of record for EDF in the present case, and received a letter from Rauch, Drs. Harris and Highland, all of EDF, outlining the procedure to be used by CPSC in banning TRIS treated garments, which is the procedure that CPSC has attempted to follow under § 1261(q)(1)(A).

8. During this same period members of the Commission received information and opinions from outside sources by telephone.

9. At a meeting of the technical staffs of CPSC and EDF held in Bethesda, Maryland on February 18, 1977, the various tests and results of tests were discussed and indicated that the tests done on mice, rats and rabbits relating to the ingestion and absorption of TRIS were anything but conclusive, that the effects were not necessarily cumulative and Dr. Harris of EDF stated frankly that there was no scientific method for extrapolating from animals to humans in terms of carcinogenicity and near the end of the meeting Mr. Rauch, representing EDF at such meeting, and presently in this court, stated at page 31:

"One of our concerns here, of course, is the Commission act promptly on this. I think a concern that has developed in my mind as I listened to some of the discussion this afternoon is that certainly we want to get all of the necessary information to make this judgment. But it seems to me some decisions are going to have to be made with certain questions you cannot get perfect answers for, as you all know; there is always some degree of uncertainty.

EDF has now had some petition pending before you for quite some time. This is not a new problem. We now have the NCI data. It seems to us in the interest of protecting public health, if there is any doubt in this case, that the public has got to be given the benefit of that doubt; therefore, we would like to see the Commission, of course, act promptly on this.

This afternoon I have dictated a letter which would be arriving to each Commissioner requesting a meeting on this early next week. We realize your need to accumulate additional information, but I would like a sense of how soon you think you are going to be able to act on this."

Later at page 34 of the transcript of said meeting Mr. Rauch continues:

"If you look at the statute, the section quoted back and forth in several letters dealing with what the Commission is required to do upon receipt of a petition showing reasonable ground, I would like to know whether in your judgment right now the petition we have submitted presents reasonable grounds for action?

Mr. Brown (an attorney for CPSC): There is no way an Executive Director—I am just saying the Commission is very jealous of its prerogatives.

Dr. Rauch: But that is a legal determination.

Mr. Brown: That is right. And that is what the General Counsel's office will look at.

Dr. Rauch: As I read this statute it is clear to me once that determination has been made, and presumably it can be made fairly promptly, you don't have to have complete evidence, it is 'reasonable grounds', but you are required to *publish the petition* or some form of it in the Federal Register and that will start the process moving. This has not happened to date and on our earlier petition submitted a week or so ago.

I would like to have a sense of when the legal machinery starts to move.

Mr. Brown: Having spoken to the Commissioners in their session last Wednesday, how soon is the legal analysis going to be here, it was promised to be there, it was scheduled to be March 4th and it was promised earlier—

Dr. Rauch: I think it is clear the intent of the statute is when the Commission receives something which appears reasonable on its face that *it get it out for public comment and notice.* And it just is not acceptable to the Commission to just internalize the process and keep the Commission within the petition without going ahead as the statute requires."[1] (emphasis added)

10. On March 8, 1977, a meeting of CPSC was held and Mr. Rauch, an attorney for EDF, Dr. Harris and Dr. Highland of EDF appeared and argued for immediate action on the EDF petition. The record does not indicate that there were present any representatives from the chemical industry, the textile industry, the apparel manufacturers industry or any other group or individual that might be affected by a ruling or other Commission action. At page 16 of the transcript of this meeting Mr. Rauch stated:

"Of course, it seems to us at this time that your appropriate action will be *first,* to *declare that Tris is a hazardous substance under the Federal Hazardous Substance Act.* And then using the authority of Section 2(q)(1)(A) to determine that children's garments containing Tris are banned hazardous substances.[2] (Emphasis added)

The statute is very clear. The only action required of you to move forward on this now is to make the determination under the statute that Tris is a hazardous substance. The rest of it falls right into place."

11. Most of the remainder of the March 8 meeting was taken by Dr. Harris and attorney Rauch attempting to convince the five CPSC Commissioners that they should move with dispatch, not worry about any legal challenges, and not wait for "the NCI results". These produced a statement by Commissioner Kushner:

1. Mr. Rauch is sometimes referred to as Dr. Rauch, but it appears from the record that he is one and the same.

2. This is the basic position of Springs in the present action: First, CPSC must determine that TRIS is a hazardous substance, as defined

in 15 U.S.C. § 1261(f)(1)(A), by following the procedures of the Federal Food, Drug and Cosmetic Act; second, then decide if it should be a "banned hazardous substance" under § 1261(q)(1)(A).

"Once again, there are so many assumptions that are involved here. And it seems to me that the figures there, if we are going to rely on those figures to back up a case, are simply not overwhelming. Not only are they not overwhelming, they are not terribly convincing at that level of exposure."

12. Later Dr. Harris is quoting a Dr. Mybach and produced the response from Chairman Byington at page 44:

"Transatlantic telephone call does not replace face to face meetings to talk about major studies."

13. At this meeting EDF threatened suit against CPSC to require it to act upon the EDF petition by March 15, 1977. At page 47 of the transcript Commissioner Byington states:

"One of the things I would suggest, and I guess bothers me a bit in your letter, is that in the conclusion of your letter you indicate that if we had not made a decision by the 15th we would be forced to conclude this refusal to act means a denial of the Commission.

You pointed out that should no action be forthcoming by that date, EDF intends to pursue whatever legal remedy is available to it to require the Commission to assume its statutory responsibility.

I would only suggest that if such a suit in those few days might be very counterproductive. And the reason I say it can be very counterproductive is since we are working on a very short time frame, both of us, and both of us I think have tried very forthrightly and openly to keep each other informed as to what we have, where we are going and what we are doing, and if the Commission has not made a decision, and I am not suggesting that they won't by the 15th, but if they haven't, and if the Commission is still trying to get certain pieces of information over the schedule, I have kind of a problem with the suggestion that we are looking at two to three months to move."

14. At the March 8 meeting several Commissioners raised serious questions as to the value of the studies that had been made. These questions were answered by Dr. Harris of EDF giving not only his opinions but quoting from alleged opinions of other doctors who were not present to verify the opinions or to be questioned by the Commissioners.

15. The medical reports presented to CPSC by its own staff physicians are anything but conclusive on the question of dangers from TRIS. These reports refer to problems of "dosage", "an inestimable number of imponderable questions", "exposure", "impossibility of calculation", "no hazard to humans", "impossibility of extrapolation of animal data to humans", "that there are a thousand chemicals known to produce cancer in animals and about 30 of these have also been found to be carcinogenic in man".

16. A meeting of the Commission, closed to the public, was held on April 4, 1977 with two members of its legal staff and four members of its Office of Public Affairs [3] present to discuss whether TRIS should be banned and under what section of the law. The primary choice was between 15 U.S.C. § 1261(q)(1)(A) or (B) of the same section. Section (A) applies to:

"Any toy or other article intended for use by children, which is a hazardous substance, or which bears or contains a hazardous substance in such manner as to be susceptible of access by a child to whom such toy or other article is entrusted;"

and (B) covers:

"Any hazardous substance intended, or packaged in a form suitable, for use in the household, which the Secretary by regulation classifies as a 'banned hazardous substance' on the basis of a finding that, notwithstanding such cautionary labeling as is or may be required under this chapter for that substance, the degree or nature of the hazard involved in the presence or use of such substance in house-

---

3. This ratio of lawyers to public relations people, together with the transcript of such meeting, convince this Court that the Commission was more concerned with its image than with the legal basis of its action.

holds is such that the objective of the protection of the public health and safety can be adequately served only by keeping such substance, when so intended or packaged, out of the channels of interstate commerce . . . ."

17. Although no formal vote was taken of the Commission at the April 4 meeting, there appeared in the April 8, 1977 Federal Register the ban on TRIS treated articles which generated this lawsuit. The notice at page 18853 indicates that "Commission *proposes* to amend 16 CFR 1500.18 by adding a new subsection (d)",[4] and this action is said to be pursuant to the provisions of the Federal Hazardous Substances Act, 15 U.S.C. § 1261(f)(1)(A), (g), (q)(1)(A) and § 1269(a). This ban provides:

"(d) Toys and other children's articles presenting toxicity hazards. Under the authority of sections 2(f)(1)(A), 2(g), 2(q)(1)(A), and 10(a) of the Act, the Commission has declared that the following articles are banned hazardous substances because they are toys or other articles intended for use by children that are hazardous substances, or bear or contain hazardous substances in such manner as to be susceptible of access by a child to whom they are entrusted, based on the fact that they may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonable foreseeable handling or use, including reasonably foreseeable ingestion by children, because of their toxicity:

(1) Children's wearing apparel made from fabric which contains TRIS (2, 3-Dibromoprophyl) phosphate and which is in interstate commerce on April 8, 1977 or which is introduced into interstate commerce after that date or which has not yet been washed, (even if it has been sold before that date;) and

(2) Uncut fabric, intended for sale to consumers for use in children's wearing apparel, which contains TRIS (2, 3-Dibromoprophyl) phosphate and which is in interstate commerce on April 8, 1977 or which is introduced into interstate commerce after that date or which has not yet been washed (even if it has been sold before that date)."

18. At the closed meeting of the Commission on April 4, 1977, it was apparent that the members were still receiving ex parte advice, evidence and information, but were quite concerned with the possibility of having to explain their decision or any actions taken to a United States District Court. The general counsel for the Commission said he had talked with Rauch the morning of the meeting and Rauch was concerned about manufacturers or retailers dumping TRIS products on the market, although he had no evidence that this was happening. Attorney Rauch made the same statement to this Court, but again had nothing to back up this claim. The Commission also discussed a letter received from Professor Bruce N. Ames of the University of California at Berkeley which strongly recommended the TRIS ban. This letter was sent to the Commission following its telephone conversation from Professor Ames to Commissioner Franklin on February 28, 1977 in which Ames expressed his views on the carcinogenicity of TRIS and Commissioner Franklin suggested he put his views in a letter. (See plaintiff's exhibit 3–P). Some of the Commissioners felt the letter and its lengthy appendix[5] were impressively worded, but they were unsure of his conclusions. It was decided to refer the letter to one Rosenthal (first name not given) for his opinion. Then followed this dialogue at page 74 of the transcript.

---

4. Inclusion of the word "proposes" must have been a "Freudian Slip", since this would have been the proper way to give notice and begin a rule making process. This was changed by correction dated April 13, 1977, FR 21274, leaving out "proposes to".

5. The appendix contains information supporting the conclusions of Ames and under "Acknowledgements" he thanks, among others, Robert Harris (of the Environmental Defense Fund) for help. This is the same Dr. Robert Harris who presented the case for EDF in other appearances before CPSC at which no representatives of parties manufacturing TRIS, children's sleepwear or retailing the same were present.

"Mr. Clay (member of the office of Public Affairs of CPSC): And I don't know how long it will take.

Commissioner Byington: There is [sic] a couple of ways to do it. That he could either have a chance to read this letter and have some of his people check a couple of things out.

Mr. Clay: He has seen the letter.

Commissioner Byington: And talk to any of the Commissioners individually about it or write a memorandum to the Commission on the letter.

Commissioner Pittle: That is okay.

Commissioner Byington: A memorandum is a hell of a lot worse. It is going to become a part of the record. And he is going to want to take a lot more time to write a memorandum than he would give you in an off-the-top-of-the-head . ..

Mr. Clay: He is very sensitive to what he is going to be saying.

Commissioner Byington: Because the memorandum will find itself in front of a judge. A telephone conversation that he is willing to discuss with you the pros and cons of any of the paragraphs in there is a different thing.

But I would suggest that we wait until tomorrow afternoon or Wednesday and let any of the Commissioners just kind of chat with Bob."

19. At the April 4 meeting Commissioners and members of the staff felt that the total recall of TRIS treated children's sleepwear could reach 120,000,000 units and as much as $900,000,000. In 42 Federal Regulations 18852 the Commission stated that it estimated that there were approximately 20,000,000 garments or 7,000,000 yards of fabric in the "pipeline" between the fabric manufacturer, the garment manufacturer, the retailer and the purchaser.

20. On April 20, 1977, the American Apparel Manufacturing Association (AAMA) brought suit against CPSC in the United States District Court for the District of Columbia contending that the Order of the Commission banning TRIS, which put the entire economic burden for repurchase under 15 U.S.C. § 1274 upon the apparel manufacturers, was improper and should be expanded to include TRIS-treated fabric, fiber and yarn incorporated in or intended to be incorporated into children's wearing apparel. The presiding judge in that case, on his own motion, indicated that some representative of the fabric manufacturers should be before the court and in effect interplead American Textile Manufacturers Institute (ATMI) a non-profit corporation whose membership includes Springs and more than 190 other textile manufacturers. This intervention was not on behalf of Springs, or any particular members of the ATMI, and was not authorized by Springs. It was an action by the court that ATMI under the circumstance was compelled to accept. In that action (Civil Action No. 77–682 in the District Court for the District of Columbia) the Judge issued an Order dated May 3, 1977 finding that CPSC had acted arbitrarily and capriciously in too narrowly defining "banned hazardous substances" in its April 8, 1977 ban on the sale of certain TRIS-treated wearing apparel by placing the entire economic burden resulting from the ban upon manufacturers of children's wearing apparel, and the Court extended the ban to include all fabric, yarn or fiber which contains TRIS and which is used or intended to be used in children's wearing apparel.

21. As a result of this Order, CPSC on May 5, 1977, published the Order in the Federal Register, page 22878, and cited the Order as the authority to extend the ban and then complied with the Order by amending the original ban to include all fabric, yarn or fiber containing TRIS and used or intended for use in children's wearing apparel.

22. On or about May 12, 1977, the United States Court of Appeals for the District of Columbia stayed the District Court's Order and the Commission's May 5 ban. Thereafter on May 19 said Court of Appeals lifted the stay and vacated the district court's Order upon representation of the Commission that it would take prompt and decisive action in the matter, the Commis-

sion having indicated to the Court that it would expand the ban pursuant to its own authority rather than under the Judge's May 3 Order.

23. On Friday, April 22, 1977, representatives of the Independent Cutters and Sewers of Children's Sleepwear met with the Commission and submitted a petition to reconsider the form of the Commission's April 8 ban to include fabric, yarn and fiber. On April 26 the Commission received a letter of EDF requesting similar extension of the ban. In neither case did the Commission notify Springs or any representative of the manufacturers or producers, who might be adversely affected by these petitions, that such petitions had been filed or were under consideration by the Commission.

24. On the same day, Friday, April 22, 1977, the Commission held an executive session to consider the petition filed that day, and to also consider what action should be taken in relation to the matter pending before the district court in the District of Columbia. A transcript of this executive session, which has been marked "restricted data" and "confidential" was produced by CPSC upon motion of the plaintiff, for in camera inspection by the Court. The Court finds that the information revealed by this hearing is important to the case and is making the transcript a part of the record as the Court's Exhibit No. 1.

25. It is obvious from reading the actual language of the commissioners that they considered "interpretations" to be handled by press releases. That these "interpretations" would be handled by Commission action upon recommendation by its general counsel in order to clear up confusion that had resulted from its April 8 ban. It is also obvious from this transcript that the Commission was of the opinion that the Judge handling the AAMA case was going to extend the ban to fabric, yarn and fiber and their concern was whether to submit language of a proposed expansion of the ban to the Judge, or to await his Order and allow the Order to speak for itself.

26. On June 1, 1977, after the present action was begun and the temporary restraining order of May 24, 1977 had been filed, the Commission expanded the ban again and this time preceded it with a lengthy history, explanation and certain findings, which are found in Federal Register, Volume 42, No. 105 at page 28060. The ban itself reads the same as that published on May 5, but the statutory findings preceding the ban give the statutory definitions of "hazardous substance", "toxic" and "banned hazardous substance" and go on to explain reasons why the Commission had worded the ban in the manner set forth. At 28063 it states:

"There were other important reasons, besides washing by consumers, why the Commission framed its ban in the manner it did. These include the massive marketplace disruption that such a ban would undoubtedly involve; the increased and needless anguish that the parents of children who have been exposed to the washed clothing and fabric would feel; and the practical difficulties associated with tracing and repurchasing approximately 120 million items that are years old and often lacking identifying labels. As already mentioned, sections 2(f)(1)(A) and 2(g) of the FHSA defined the terms 'hazardous substance' and 'toxic'. The Commission believes that the TRIS products it has banned, on April 8 and in the order issued below, fall clearly within both of those definitions. Since they are also intended for use by children, they are banned by section 2(q)(1)(A) which defines the term 'banned hazardous substance'. As the legislative history states, '[t]oys or other articles intended for use by children which bear or contain a hazardous substance are banned by the language of the bill itself . . .' (Senate Report No. 1551, 89th Cong., 2nd Sess., pg. 2).

The Commission has the discretion under section 3(a) of the FHSA, to conduct a rulemaking procedure before it declares a substance to be a hazardous substance. This provision is available for use '[w]henever in the judgment of the [Commission] such action will promote the objec-

tives of this Act by avoiding or resolving uncertainty as to its application . . .' If the Commission had any uncertainty about whether the TRIS products were hazardous substances, it would have conducted a rule-making procedure according to the procedures described in sections 701(e)(f), and (g) of the Federal Food, Drug and Cosmetic Act, as required by § 3(a)(2) of the FHSA.

The Commission found, however, that the evidence supporting the risk of illness presented by the TRIS products is overwhelming. The two-year NCI feeding study shows the potency of TRIS as a carcinogen in animals. The strong link between animal carcinogens and human carcinogens is supported by numerous authorities. The available tests concerning absorption of TRIS through the skin are persuasive and the resulting risk assessments performed by NCI have enormous implications for the health of children who would continue to wear TRIS-treated clothing. The fact that the cases of cancer will not appear immediately does not minimize the seriousness of the present risk.

Separate from the question of a proceeding under section 3(a) of the FHSA, there is the consideration that the Administrative Procedure Act imposes requirements on agencies for notice of proposed rule-making, opportunity for public participation, and a delayed effective date (5 U.S.C. 553). However, these requirements are not applicable to interpretive rules or general statements of policy and are therefore not applicable to the interpretation announced in this document. Even if the rules were to be considered general rulemaking, the Commission for good cause finds that notice and public comment and a delayed effective date are contrary to the public interest because the statutory intent and structure of the FHSA is that children's articles that may

cause substantial illness based upon their toxicity must be banned without any delay." [6]

27. In the statutory findings accompanying the April 8 ban there was no finding that the evidence supporting the risk of illness presented by TRIS products was overwhelming. In the background information set forth in the April 8 and the June 1 bans there is continued reference to information supplied by Environmental Defense Fund, codefendant in the present case, Hooper and Ames, a research associate and professor of biochemistry at the University of California in Berkeley to the report of the National Cancer Institute, Bureau of Bio-Medical Science, a division of CPSC, and reports from Dr. Harris of EDF. None of which have been tested by cross examination and are ex parte communications.

28. That on September 27, 1973, the Commission published in the Federal Register, 38 Fed.Reg. 27012 (a regulation codified as 16 C.F.R. § 1500.3(c)(2)) which prescribes a test for determining whether a substance is toxic within the meaning of § 1261(g), and this regulation has remained in force at all times thereafter and is the only published regulation in the Commission setting forth the test for determining whether a substance will be determined "toxic" by the Commission. This publication was obviously an interpretation since it set forth the number of white rats or rabbits to be used in various experiments, the size or weight of such animals and the effect of the substance upon them in order to be labeled "toxic". This publication also gave definitions for "irritant," "strong sensitizer", "flammable", "extremely flammable", "extremely flammable contents of self-pressurized container", "substantial personal injury or illness", "proximate results" and other terms which needed to be more fully defined. However, these interpretations and definitions did not attempt to define any particular substance, element or article

---

**6.** CPSC in this June 1st publication was obviously trying to strengthen its case in this Court and revive its ban which had already been corrected twice and expanded once by order of

the D.C. Court. This language of June 1st is simply a self-serving declaration set forth in the Federal Register.

as being toxic, hazardous or a banned hazardous substance under the Act, but just explained certain requirements and definitions.

29. That the TRIS regulation published April 8, 1977 and all amendments and additions thereto are based in part on a finding by the Commission that TRIS is a "toxic" substance under § 1261(g) and a "hazardous substance" under § 1261(f)(1)(A), but CPSC did not follow the statutes in making these findings.

30. That before adopting and publishing any of the TRIS regulations CPSC did not publish notice of the proposed regulation in the Federal Register, did not afford Springs an opportunity to present its views thereon and did not give any type of notice, that could be considered "public notice" of its actions or intended actions.

31. That on May 9, 1977, Springs Mills tendered to CPSC for filing at its office in Washington, D.C. plaintiff's "objections to statutory interpretation and request for public hearing", and CPSC has refused to accept these objections for filing.

32. That since the publication of the TRIS regulation on April 8, 1977 and the subsequent amendments and additions thereto CPSC has failed to afford Springs a hearing on its objections to the TRIS regulation, has failed to accept for filing the objections of Springs to the regulation and request for public hearing, has failed to publish a notice in the Federal Register specifying those parts of the TRIS regulation stayed by the filing of objections of the plaintiff, has failed to recognize any possible stay of the regulation by the objection and has failed to take any steps to cause a public hearing to be convened for the purpose of receiving evidence on the issues raised by the objections.

33. That on April 13, 1977, Richard E. Rapps, acting associate executive director for compliance and enforcement dispatched a letter to Springs advising it of the ban on all children's wearing apparel made from fabric containing TRIS and that any continued sale of the fabric was prohibited and subject to penalties provided by law and advising that inspection of "randomly selected firms" would be conducted by the Commission to insure compliance with the ban. This letter also threatened injunction and/or criminal prosecution in the event a firm did not initiate appropriate corrective action.

34. That on or about May 17, 1977, the Commission filed an action against F. W. Woolworth Co. in the United States District Court for the Southern District of New York alleging that Woolworth had continued to sell TRIS-treated children's wearing apparel in violation of the Commission's April 8 ban. This action resulted in an entry of final judgment, which was in effect a consent order enjoining Woolworth from selling such articles and requiring Woolworth to reimburse CPSC $5,000 to cover the cost of the action. In said action it was alleged that "On April 8, 1977, the Commission published an *Order* declaring the following children's wearing apparel and related articles and products treated with TRIS are 'banned hazardous substances' . . ." (emphasis added).

35. The final judgment of the Court for the Southern District of New York also refers to the April 8 action of the CPSC as an "order" and later as a "regulation".[7]

36. That the action by CPSC in adopting the TRIS ban and the amendments thereto has caused havoc in the children's sleepwear market and generated confusion, lawsuits and uncertainty among all who retail these products, manufacture such products or manufacture the fabric used in such products. CPSC admits litigation among the various segments of this industry could go on for years as a result of the Commission's action which invokes the repurchase provisions of § 1274. That the loss to Springs as a result of the CPSC TRIS ban will total at least $2,000,000.00.

---

7. The U.S. Attorney for the Southern District of New York knew he was enforcing a CPSC regulation, rule or order and not some "interpretation", which is the label CPSC is trying to sell in the District of South Carolina.

## CONCLUSIONS OF LAW

A. This action is brought under the laws and under the Constitution of the United States. It seeks declaratory judgment and the Court has jurisdiction of all parties pursuant to 28 U.S.C. §§ 1331, 1337, 1346 and 2201. The venue is properly laid in this district.

B. The basic issue is whether plaintiff has been denied due process of law because of actions taken by the Consumer Product Safety Commission in declaring TRIS a "banned hazardous substance" within the meaning of 15 U.S.C. § 1261(q)(1)(A) in not conducting a rule-making hearing with proper notice to those affected by the proposed ban and an opportunity for it to appear, present testimony and cross-examine witnesses presented by the Commission and test the weight and sufficiency of the evidence considered by the Commission. This claimed denial of due process could result from either an unconstitutional interpretation placed upon the law by CPSC or from a finding that the statute itself is unconstitutional.

In the brief of CPSC the issue is stated succinctly:

"The Commission has not engaged in formal rule-making process provided for by 15 U.S.C. § 1262(a)(2) or 21 U.S.C. § 371(e), nor has it afforded Springs Mills an opportunity for a hearing.

Only the legal issue of whether the Commission was required to engage in rule-making in accordance with 15 U.S.C. § 1262(a)(2) remains for resolution by this Court."

C. The Federal Hazardous Substances Act, 15 U.S.C. §§ 1261–1274 at § 1261(f)(1)(A) defines the term "hazardous substance" as follows:

"(1)(A) Any substance or mixture of substances which (i) is toxic, (ii) is corrosive, (iii) is an irritant, (iv) is a strong sensitizer, (v) is flammable or combustible, or (vi) generates pressure through decomposition, heat or other means, if such substance or mixture of substances may cause substantial personal injury or substantial [injury] during or as a proximate result of any customary or reasonably foreseeable handling or use, including reasonably foreseeable ingestion by children."

Various words used in this definition are further described, but only "toxic" is applicable to this case. § 1261(g) provides:

"The term 'toxic' shall apply to any substance (other than a radioactive substance) which has the capacity to produce personal injury or illness to man through ingestion, inhalation, or absorption through any body surface."

Section 1261(q)(1) provides:

"The term 'banned hazardous substance' means (A) any toy, or other article intended for use by children, which is a hazardous substance, or which bears or contains a hazardous substance in such manner as to be susceptible of access by a child to whom such toy or other article is entrusted; or (B) any hazardous substance intended, or packaged in a form suitable, for use in the household, which the Secretary by regulation classifies as a 'banned hazardous substance' on the basis of a finding that, notwithstanding such cautionary labeling as is or may be required under this chapter for that substance, the degree or nature of the hazard involved in the presence or use of such substance in households is such that the objective of the protection of the public health and safety can be adequately served only by keeping such substance, when so intended or packaged, out of the channels of interstate commerce: Provided, That the Secretary, by regulation, (i) shall exempt from clause (A) of this paragraph articles, such as chemical sets, which by reason of their functional purpose require the inclusion of the hazardous substances involved or necessarily present an electrical, mechanical, or thermal hazard, and which bear labeling giving adequate directions and warnings for safe use and are intended for use by children who have attained sufficient maturity, and may reasonably be expected, to read and heed such directions and warnings, and (ii) shall exempt from

clause (A), and provide for labeling of, common fireworks (including toy paper caps, cone fountains, cylinder fountains, whistles without report, and sparklers) to the extent that he determines that such articles can be adequately labeled to protect purchasers and users thereof.

(2) Proceedings for the issuance, amendment, or repeal of regulations pursuant to clause (B) of paragraph (1) of this subsection shall be governed by the provisions of § 371(e), (f), and (g) of Title 21: Provided, That if the Secretary finds that the distribution for household use of the hazardous substance involved presents an imminent hazard to the public health, he may by order published in the Federal Register give notice of such finding, and thereupon such substance when intended or offered for household use, or when so packaged as to be suitable for such use, shall be deemed to be a 'banned hazardous substance' pending the completion of proceedings relating to the issuance of such regulations."

Regulations declaring hazardous substances are covered by § 1262 of the Act, paragraph (a)(1) provides:

"Whenever in the judgment of the Secretary such action will promote the objectives of this chapter by avoiding or resolving uncertainty as to its application, the Secretary may *by regulation* declare to be a hazardous substance, for the purposes of this chapter, any substance or mixture of substances which he finds meets the requirements of subparagraph (1)(A) of section 1261(f) of this title.

(2) Proceedings for the issuance, amendment or repeal of *regulations* under this subsection and the admissibility of the record of such proceedings in other proceedings, shall in all respects be governed by the provisions of § 371(e), (f), and (g) of Title 21, except that—

(A) the Secretary's order after public hearing (acting upon objections filed to an order made prior to hearing) shall be subject to the requirements of section 348(f)(2) of Title 21; and

(B) the scope of judicial review of such order shall be in accordance with the fourth sentence of paragraph (2) and with the provisions of paragraph (3) of section 348(g) of Title 21." (emphasis added)

These references are to procedures set up under the Food, Drug and Cosmetic Act.

▮ Under the rule-making procedures of the Food, Drug and Cosmetic Act, that are incorporated by Congress in the Federal Hazardous Substances Act, all persons adversely affected by the proposed TRIS regulations are entitled to advance notice of rule making (section 371(e)(1)), a delayed effective date of the regulation (section 371(e)(1)), the right to file objections within 30 days (371(e)(2)), the right to automatic stay of the effective date of portions of any regulations to which objections are filed (section 371(e)(2)), the right to a public hearing on such objections and a decision based on a fair evaluation of all the evidence of record at such hearing, (section 348(f) and 371(e)(3)) and to judicial review under 348(g)(2).

CPSC contends that under § 1261(q)(1)(A) and § 1262(a)(1) it has authority to declare an article a "banned hazardous substance" without going through the steps required for the issuance of regulations set forth in the Food, Drug and Cosmetic Act. The Commission, therefore, claims the right to declare without any notice, hearing or opportunity of interested parties to comment that an article is a "banned hazardous substance", if the Commission concludes from testimony and statements not subject to cross examination, from data not subject to public scrutiny or examination, and from ex parte conversations and communications from lawyers, physicians and research personnel interested in obtaining a ban, that such article is or contains a hazardous substance and is susceptible to access by a child. The Commission further asserts that under § 1262(a)(1) the Commission has the discretion as to whether to grant a hearing or just issue an edict. For its own convenience, and to prevent the application of either the Food, Drug and Cosmetic Act or the rule-making provisions of the Adminis-

trative Procedure Act, 5 U.S.C. § 553 the Commission refers to these orders, which have the effect of law, as "interpretations".

The Commission, which has the duty of requiring adequate labels and warnings to be affixed to articles, should not apply a false label to its own action in an effort to deprive the plaintiff of its right to a hearing and constitutional due process. If CPSC thinks it has authority under either § 1261(q)(1)(A) or § 1262(a)(1) to bypass the rule-making procedure, why has it expended so much energy trying to convince the parties, the public and this Court that the TRIS ban is merely an interpretation?

The Commission relies upon the legislative history of the Federal Hazardous Substances Act and particularly a letter from the Secretary of Health, Education and Welfare dated August 20, 1959 to the Chairman of the House Committee on Interstate and Foreign Commerce, which is printed in U.S.Code Congressional and Administrative News 1960–179 at page 2849 under the heading of "Declaratory Regulations as to Coverage". The Secretary of HEW is expressing his concern about the "if clause" contained in § 1261(f)(1)(A). The term "hazardous substance" is defined followed by this language:

> ". . . if such substance or mixture of substances may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonably foreseeable handling or use, including reasonably foreseeable ingestion by children."

The letter of the Secretary states:

> "It is apparent that, even with the above-suggested clarifications, the application of the second part (i.e. the so-called "if" clause) of the basic definition of 'hazardous substance' in the bill is so largely dependent on judgmental factors—e. g., what is 'reasonably foreseeable'—that it will lead to considerable uncertainty and

much costly litigation, with different courts and juries reaching different results, unless some mechanism for authoritatively resolving this uncertainty short of litigation is devised. We realize that, on the one hand, in view of the broad sweep of the bill, and because of the constant development of new useful but hazardous substances suitable for household use, the inclusion of a statutory list of covered substances (an analogy to the list in the Federal Caustic Poison Act) [8] or, the limitation of coverage to substances listed by regulation would not be feasible. And while, on the other hand, we would prefer elimination of the "if" clause altogether from the point of facility of enforcement, we recognize that the inclusion of some such clause can be justified.

> It is feasible, however, and we strongly urge, that the committee include in the bill provisions deeming a substance to be hazardous where the Secretary *by regulation* declares it to be such upon the basis of a finding that it meets the requirements of the bill's basic definition of 'hazardous substance'. The Secretary should be authorized to take such action whenever in his judgment this will promote the objectives of the bill by avoiding or resolving uncertainty. (The failure of the Secretary to take such action, of course, should not absolve anyone from the consequences of noncompliance with the labeling requirements of the bill in the case of a substance which is 'hazardous' under the basic definition.) We would not object to making the issuance, amendment, or repeal of these declaratory *regulations* subject to procedural safeguards [with [9] opportunity for administrative hearing, and for judicial review on the basis of the hearing record] such as those contained in sections 701(e)–(g) of the Federal Food, Drug and Cosmetic Act." (emphasis added)

---

**8.** Formerly 15 U.S.C. §§ 401 et seq. now repealed in the body of the statute listed various "dangerous caustic or corrosive substances" covered by said act by both name and chemical formula, all of which were commonly known poisons.

**9.** The language in brackets was omitted from EDF's version of this letter as set forth in its brief.

■ The continuous reference to "regulation" in the applicable parts of the statute and in the legislative history clearly indicate the congressional intent that the Commission proceed with rule-making procedures, as set forth in the Food, Drug and Cosmetic Act, and not attempt to make final decisions having nationwide impact without affording affected parties the basic requirements of due process.

■ The Commission cannot fit its action banning TRIS within the exemption provided by the Administrative Procedure Act, 5 U.S.C. § 553(d)(2) as "interpretative rules and statements of policy." Interpretative rules are statements as to what an administrative officer thinks the statute or regulation means,[10] while "regulations", "substantive rules" or "legislative rules" are those which create law, usually implementary to existing law. *National Motor Freight Traffic Assn. v. U. S.*, 268 F.Supp. 90 (D.C.D.C. 1967). Under *Continental Oil Co. v. Burns*, 317 F.Supp. 194 (D.C.Del.1970) and *American Bancorp, Inc. v. Board of Governors*, 509 F.2d 29 (8th Cir. 1974) four criteria have been established to determine whether agency action involves an interpretation or a substantive regulation, as follows: (1) the complexity and pervasiveness of the rules issued, (2) the drastic changes effected in existing law by the rules, (3) the degree of retroactivity and its impact and (4) the confusion and controversy engendered by practical difficulties of compliance with the new rules.

The TRIS bans issued by CPSC fit each one of the above criteria. The Commission action banning TRIS is complex, as evidenced by the continuous press releases of CPSC to explain it, and the fact that it has on four occasions amended, corrected or expanded the regulation published April 8. The regulation is pervasive since it is far reaching and influences every party handling TRIS. It represents a drastic change

from the existing law, since the United States Government through the Commerce Department originally required TRIS to be used in children's sleepwear to meet anti-inflammatory standards set by the Department and TRIS was the only anti-inflammatory product then available, capable of meeting the requirements of the law. Now CPSC, another agency of the same government, makes a drastic change by not only demanding that TRIS be no longer used in the process, but that the repurchase provisions of 15 U.S.C. § 1274 become effective.

The degree of retroactivity and its impact are enormous, since merchants, manufacturers of TRIS treated pajamas and manufacturers of fabric or fiber used therein must buy back products sold years ago.

Confusion and controversy engendered by practical difficulties of compliance with the new rules are evident by the litigation that has resulted, the confusion among the commissioners as evidenced by the various transcripts of their meetings and their admissions that litigation between retailers, manufacturers and others in the children's sleepwear pipeline may go on for years.

That any agency of the United States Government should try to hide such far reaching and drastic measures under the label of an "interpretation" is scandalous. It is particularly shocking when these same commissioners are in a position to pass upon labels, warnings and brands placed upon or accompanying articles in commerce within this country. Their action is the most flagrant misbranding imaginable. The new TRIS ban is not an interpretation but a new rule having the effect of a law with the most far reaching consequences.

■ By finding TRIS-treated children's sleepwear to be a "banned hazardous substance" the Commission set in motion the provisions of § 1274, one of the most drastic procedures known to law.[11] Congress could

---

**10.** The proper use of "interpretative rules" is found in 16 C.F.R. 1500 where CPSC defines in detail the meaning of such words as: "toxic," "highly toxic," "irritant", "strong sensitizer", etc. None of these definitions mention or refer

to a particular product, compound, chemical, article or combination thereof.

**11.** § 1274 Repurchase of banned hazardous substances; procedure; definitions.

not have provided such a remedy without intending that it be used only after a full due process hearing.

■ Defendants' argument that the Commission may declare an article a "banned hazardous substance" under § 1261(q)(1)(A) without first deciding that it is a "hazardous substance" under § 1261(f)(1)(A) is unpersuasive. The Court is also unpersuaded by its argument that § 1262(a)(1) gives the Commission the option of going through the rule-making process or of just issuing its mandate that some article is suddenly a "hazardous substance" or a "banned hazardous substance".

This position is not supported by the language of the statute or by the legislative history. This history, mentioned above, shows clearly that Congress intended the Secretary to act "by regulation" which would mean under the rule-making process. Congress also indicated its concern for the powers given CPSC by requiring rule making under the Federal Food, Drug and Cosmetic Act rather than the Administrative Procedure Act in matters relating to hazardous substances. The Administrative Procedure Act allows certain rules to be made on a "notice and comment" basis, but § 371(e), (f), and (g) of the Food, Drug, and Cosmetic Act require a notice of a hearing, the right of the objecting party to cross examine witnesses presented by the Commission and to present evidence in opposition thereto, and other evidence which may be relevant or material to the issues, and the Commission is required to issue an Order based *solely* [12] on the evidence of record at the public hearing. This order "shall be based on a fair evaluation of the entire record of the hearing" and must be accompanied by a "statement setting forth in detail the findings and conclusions upon which the order is based." Obviously, Congress did not intend for matters under the Federal Hazardous Substances Act to be handled or decided on the basis of ex parte communications with members of the Commission or without effective notice so that objecting parties could appear, present evidence and test the validity of the information presented. As Justice Frankfurter has stated:

" . . . Fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights . . . . [A n]o better instrument has been devised for arriving at the truth than to give a person in jeopardy of serious loss notice of the case against him and opportunity to meet it." *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 71 S.Ct. 624, 95 L.Ed. 817.

This fairness, which is another way of saying due process, is completely lacking in the actions of CPSC banning TRIS.

Defendants argue that a special rule applies when the rights of children are involved and that (q)(1)(A) allows an immediate "banned hazardous substance" finding on toys or other articles intended for use by children without first finding that an article is a "hazardous substance" as defined in § 1261(f)(1)(A). The fact that children may be involved does not obviate the necessity that CPSC by proper rule-making procedure determine that an article is a "hazard-

(a) In the case of any article or substance sold by its manufacturer, distributor, or dealer which is a banned hazardous substance (whether or not it was such at the time of its sale), such article or substance shall in accordance with regulations of the Secretary, be repurchased as follows:

(1) The manufacturer of any such article or substance shall repurchase it from the person to whom he sold it, and shall—

(A) refund that person for the purchase price paid for such article or substance,

(B) if that person has repurchased such article or substance pursuant to paragraph (2) or (3), reimburse him for any amounts paid in accordance with that paragraph for the return of such article or substance in connection with its repurchase, and

(C) if the manufacturer requires the return of such article or substance in connection with his repurchase of it in accordance with this paragraph, reimburse that person for any reasonable and necessary expenses incurred in returning it to the manufacturer.

Subparagraph 2 provides for repurchase by a distributor and subparagraph 3 provides for repurchase by a retailer.

**12.** Not one that is based on ex parte contacts and communications with the Commissioners.

ous substance", before it may go on to find that it is a "banned hazardous substance."

The due process requirements of the Constitution do not fly out of the window when the rights of children come in the door. Even a person, who admits committing the most grievous crime against a child, is still entitled to due process of law, and the fact that a child may use a toy or an article does not deny due process protection to the retailer, manufacturer or supplier of a component part of such article. The obvious intent of Congress was that after a proper finding [13] of "hazardous substance", if the toy or article was obviously intended for use by children, then the term "banned hazardous substance" could be applied to it and thereby invoke the repurchase provisions of § 1274.

■ To interpret § 1261(q)(1)(A) and § 1262(a)(1) as urged by the defendants would require a finding that Congress had enacted a patently unconstitutional law. This construction must be avoided by the Court when possible.

"It is axiomatic that statutes are to be interpreted to avoid constitutional issues unless their plain and explicit meaning requires that constitutional issues be met and decided. *U. S. v. Perez*, 488 F.2d 1057, 1059 (4th Cir. 1974). *See also International Association of Machinists v. Street*, 367 U.S. 740 (1961) at page 749, 81 S.Ct. 1284, 6 L.Ed.2d 1141:
Federal statutes ought to be so construed as to avoid serious doubt of their constitutionality. 'When the validity of an Act of Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principal that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided'. *Crowell v. Benson*, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598, 619."

■ The Federal Hazardous Substances Act, particularly § 1261(q)(1)(A) can fairly be interpreted as meeting the due process requirements of the Constitution by requiring that CPSC use the rule-making procedure provided therein and outlined in 21 U.S.C. § 371. All this requires is that there be a proper finding, after adequate notice and a fair hearing, that an article is a "hazardous substance" before proceeding on to the next determination—"banned hazardous substance".

Any other construction would allow the commissioners to deprive hundreds of persons of millions of dollars without a hearing, without notice of a hearing, without an opportunity to present evidence, without the opportunity to cross examine and otherwise test the credibility and validity of evidence presented, and such an interpretation would also allow and condone the closed meetings between proponents of such a ban and the commissioners, together with submission of ex parte communications, material and information to a quasi-judicial body, when it is deliberating an important case, which is exactly what has happened in this matter.

The Supreme Court has carefully protected the right to due process. *See Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). The Supreme Court found the replevin laws of Florida and Pennsylvania unconstitutional as being violative of the due process clause, since no hearing was afforded to the possessor of personal property prior to the seizure of this property, even though seizure was allowed under state law, was accompanied by a bond to cover any damages resulting therefrom, and seizure was under a conditional sales contract whereby the possessor lacked full legal title to the goods. The goods seized in *Fuentes* were a stove, a stereo, a table and a bed. They were not the necessities of life, and as the Court pointed out, the possessor "lacked full title to the chattels; and their claim even to continued possession was a matter in dispute." However, the Court struck down the state statutes as not providing a notice and an opportunity to be heard before losing only temporary possession of these household items. *Fuentes* also held that it

---

**13.** Under the procedures set forth in the Federal Food, Drug, and Cosmetic Act.

was fundamental that there be a right to notice and an opportunity to be heard at a meaningful time and in a meaningful manner, and this meant before seizure. At page 81, at page 1994 of 92 S.Ct. it is stated:

> "If the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented. At a later hearing, an individual's possessions can be returned to him if they were unfairly or mistakenly taken in the first place. Damages may even be awarded to him for the wrongful deprivation. But no later hearing and no damage award can undo the fact that the arbitrary taking that was subject to the right of procedural due process has already occurred. 'This Court has not . . . embraced the general proposition that a wrong may be done if it can be undone.' *Stanley v. Illinois,* 405 U.S. 645, 647, 92 S.Ct. 1208, 1210, 31 L.Ed.2d 551, 556."

It is important to realize that *Fuentes* involved a few household items, a small amount of money, a bond to cover any damages that might result and the possibility that the property would be returned. In the present case the Commission's action affects thousands of retailers, hundreds of manufacturers, millions of articles and many millions of dollars. The tragedy is that unlike a replevin action, where the property may be returned, the action of the CPSC has put the market in children's sleepwear in such a state of confusion and disarray that the CPSC itself has no estimate or idea of when the turmoil may end. To prevent the Florida people from using their replevin process without prior notice and prior hearing, but to allow CPSC, without notice and a hearing, to ban TRIS-treated children's sleepwear as a "banned hazardous substance", invoking the repurchase provisions of § 1274, would be unthinkable.

This is not the first case in which CPSC has attempted to avoid due process by bypassing the rule-making provisions of the Food, Drug and Cosmetic Act. See *Pactra Industries, Inc. v. Consumer Product Safety Commission,* 555 F.2d 677 (9th Cir.1977). That case resulted from CPSC banning all self-pressurized products intended or suitable for household use and containing vinyl chloride. These articles were banned under § 1261(q)(1)(B). The Commission followed only the first step of the rule-making process by publishing a proposed regulation banning such items and receiving comments. In its report CPSC mentioned linking the deaths of industrial workers from cancer of the liver to vinyl chloride exposure (although but one death had been reported) and citing certain laboratory experiments conducted in a European University. Interested persons were invited to comment on the proposed regulation. After receiving nine comments, three of which were critical, the Commission promulgated its Order classifying as "banned hazardous substances" all aerosol products containing vinyl chloride and intended or suitable for household use. Pactra was one of the parties objecting to the ban and was denied a hearing. CPSC found the objections "practically void of reference to factual information which the Commission believed would lead to a contrary conclusion." It decided that *Pactra* had not stated "reasonable grounds" necessitating a hearing and a hearing was denied.

The 9th Circuit Court stated:

"The procedural prerequisites to rulemaking under section 371(e) serve to impose a discipline on the agency's decision-making process, forcing it to present ordered proof to support its position. These procedures permit affected parties to express in a direct and participatory manner their opposition and criticism of governmental action before it becomes final. The public, and the regulated industries, as well as the agency, develop a better understanding of the problem at hand by following these procedures, and the resulting regulation may be a more refined and precise statement of agency policy. The procedural restrictions imposed on the agency by section 371(e) are admittedly severe, but they are stated with particularity in the rule-making statute, and we

can find no reason to dispense with these procedures in this case. If the Commission believes that a substance should not be used where it has been shown to be potentially carcinogenic under intensive exposure conditions, its determination deserves thorough public examination. To implement that determination the agency must therefore follow the procedures Congress has prescribed.

The very absence of a formal record in this case makes it difficult for us to evaluate the agency's assertion that no record is needed or that the evidence on which it relies is sufficient to support its determination. At oral argument, the agency stated that its rule is supported by all of the files in its possession. The agency may not so neatly frustrate the formal judicial review intended by Congress when it enacted the strict procedural requirements of section 371(e). In the instant case the statute specifically predicates judicial review on the existence of a formal record and further requires that that record be established by evidence adduced at a public hearing.

Both the failure to hold public hearings and the failure to produce the formal record mandated by the statute are defects that invalidate the Commission's regulation in this case. Accordingly, the Commission's order promulgating 16 C.F.R. § 1500.1710(a)(10) is set aside."

An Order of clarification was filed by the *Pactra* court on June 13, 1977, which did not change the effect of the decision.

■ The Commission's argument that Springs and American Textile Manufacturers Institute are attempting to split a cause of action between the *AAMA* case in the District of Columbia and the case in this court is without merit. The ATMI was brought into the *AAMA* case at the insistence of the Judge, on very short notice and the issues are not the same. ATMI and Springs Mills are not in privity with one another, so the action of one does not bind the other. Springs did not authorize the ATMI to act for it in the *AAMA* case, which involved only the extent of the TRIS ban and not the basic issue of the constitutionality of such ban. The cases cited by the Commission in support of its *res judicata* argument are not applicable to the present facts.

This Court is particularly concerned by the number and type of ex parte communications received and considered by the Commission during its deliberation of the TRIS matter and strongly urges the commissioners to read the recent case of *Home Box Office, Inc. v. Federal Communications Commission* (D.C.Cir. March 25, 1977), in which the Court of Appeals remanded a decision to the FCC and required the appointment of a Special Hearing Examiner to determine the nature and source of all ex parte pleas and other approaches made to the Commission or its employees after the issuance of the first notice of proposed rule making. If the commissioners of CPSC are to make decisions drastically affecting the lives and businesses of citizens, they should conduct their quasi-judicial proceedings in public, consider only the evidence produced at such public hearings and refrain from all ex parte communications. They may not avoid this ethical requirement by failing or delaying the filing of a petition so as to prevent the public from knowing a matter is under consideration. This was done in the present case, since CPSC gave no notice of the March 1976 petition of EDF, but continued to obtain information, which was used in its final decision, without providing an opportunity to interested parties to participate.

It is evident from the methods used by, as well as the legal procedures avoided by, CPSC in the *Pactra* case and in the present case that the Commission does what it pleases with little concern for the restrictions or limitations placed upon it by the Congress or the Constitution. These continuing acts are classic examples of the arrogance of bureaucracy and the abuse of power. They are confirmation of Justice Frankfurter's warning in *NcNabb v. U. S.,* 318 U.S. 332, 347, 63 S.Ct. 608, 616, 87 L.Ed. 819 (1943): "The history of liberty has largely been the history of observance of procedural safeguards."

Since CPSC has failed to follow the procedural safeguards enacted by Congress, has failed to provide a full rule-making hearing with respect to any of its TRIS bans, it has deprived the plaintiff of due process of law. Therefore, all of such TRIS bans and the amendments thereto are null and void.

Accordingly, its attempts to amend 16 C.F.R. § 1500.18 by either adding a new subsection (d) or by later amending said subsection (d) to include as a "banned hazardous substance" children's wearing apparel made from fabric containing TRIS as well as all fabric, yarn or fiber containing TRIS used or intended for use in children's wearing apparel, beginning with its publication in the Federal Register of April 18, 1977 and running through its publication in said register of June 1, 1977, must be and the same are hereby set aside.

IT IS FURTHER ORDERED that the Consumer Product Safety Commission be and it is hereby enjoined and restrained from attempting to apply or enforce against any party, any article, fabric, yarn or fiber any of its previously adopted TRIS regulations until such time as the Commission shall comply with the hearing procedures set forth in 21 U.S.C. § 371(e), (f) and (g).

AND IT IS SO ORDERED.