**RIEGEL TEXTILE CORPORATION,**
**Plaintiff-Appellant,**

v.

**CELANESE CORPORATION,**
**Defendant-Appellee.**

No. 530, Docket 80–7697.

United States Court of Appeals,
Second Circuit.

Argued Dec. 17, 1980.

Decided May 6, 1981.

Charles L. Stewart, New York City (Windels, Marx, Davies & Ives, Anthony A. Dean, Yvette Harmon, New York City, of counsel), for plaintiff-appellant.

Frank H. Wohl, New York City (Rosenman Colin, Freund, Lewis & Cohen, Joseph Zuckerman, Rodney E. Gould, Jay A. Segal, New York City, of counsel), for defendant-appellee.

Andrew S. Krulwich, Gen. Counsel, Washington, D. C. (Mana L. Jennings, Associate Gen. Counsel, Daniel L. Jennings, Atty., Consumer Product Safety Commission, Sanford M. Litvack, Asst. Atty. Gen., Robert B. Nicholson, Mark C. Del Bianco, Attys., Dept. of Justice, Washington, D. C., of counsel), for the Consumer Product Safety Commission as amicus curiae.

Before FEINBERG, Chief Judge, KEARSE, Circuit Judge, and EDELSTEIN, District Judge.*

EDELSTEIN, District Judge:

This is an appeal from an order of the Hon. William C. Conner, dismissing plaintiff's complaint, based upon federal and state law claims, for failure to state a claim upon which relief can be granted. We affirm.

Plaintiff Riegel is in the business of manufacturing and processing fabrics and garments including children's sleepwear. Defendant Celanese manufactures synthetic fibers.

In 1972, Celanese advised Riegel that it had developed a flame-retardant synthetic fiber (treated with TRIS), suitable for the manufacture of children's sleepwear.[1] After conducting its own tests for color-fastness and flammability, Riegel, between 1972 and 1976, issued to Piedmont Knitting Co. orders to purchase TRIS-treated yarn from Swift Spinning Mill, Inc. for knitting into fabric. Upon Riegel's instruction, Swift purchased sufficient TRIS-treated fiber from Celanese to make the yarn which Piedmont ordered.[2]

In March 1976, a petition was submitted to the Consumer Product Safety Commission (CPSC) by the Environmental Defense Fund (EDF), seeking an order requiring

---

* Honorable David N. Edelstein, of the United States District Court for the Southern District of New York, sitting by designation.

1. In 1971 and 1972, the Secretary of Commerce issued an apparel flammability standard pursuant to the Flammable Fabrics Act, 15 U.S.C. §§ 1191 et seq. In 1972, authority to carry out the provisions of the Flammable Fabrics Act was transferred to the Consumer Product Safety Commission. 15 U.S.C. § 2079(b). In 1974, the CPSC issued a second apparel flammability standard specifically applicable to children's sleepwear. At the time, it appears TRIS was the only flame retardant available which could comply with the applicable standards. See Spring Mills, Inc. v. United States, No. 80–633–9, at 1–2 (D.S.C. Dec. 18, 1980); Springs Mills, Inc. v. Consumer Product Safety Commission, 434 F.Supp. 416, 418–19 (D.S.C.1977).

2. There is no allegation in the complaint that Riegel purchased any TRIS-treated fiber directly from Celanese. Whether agency principles should apply to the transactions between Riegel and Piedmont and Swift was not decided by the district court and is not an issue on appeal.

labeling on TRIS-treated garments, directing that the garments be washed three times before they are worn. The basis of the petition was that TRIS might be a carcinogen. The CPSC did not hold hearings as required by 21 U.S.C. § 371(e) of the Food, Drug and Cosmetic Act, see 15 U.S.C. § 1262(a)(2), although it did solicit information from selected sources. In February, 1977, the EDF filed an additional petition with the CPSC seeking a ban on all TRIS-treated garments. Again, hearings were not held.

On April 8, 1977, the CPSC, acting under the provisions of the Federal Hazardous Substances Act (FHSA), announced that all children's clothing containing TRIS was a "banned hazardous substance" under 15 U.S.C. § 1261(q)(1)(A), and therefore was banned from interstate commerce. The CPSC also specified that the affected clothing must be repurchased pursuant to 15 U.S.C. § 1274.

On May 3, 1977, Judge George Hart, in deciding a motion for preliminary injunction in *American Apparel Manufacturer's Association v. CPSC*, No. 77–682 (D.D.C.), ordered the CPSC to expand its ban to include not only TRIS-treated apparel used or intended for use in children's clothing, but also TRIS-treated fabric, yarn and fiber. The purpose of the order was to broaden the economic burden of repurchase from manufacturers of children's apparel to include fabric manufacturers.[3] On June 1, 1977, the CPSC reissued an expanded ban on TRIS-treated material. The CPSC did not order repurchase, as it had done in its April 8 announcement, stating that it needed to clarify a number of questions concerning repurchase due to the existence of a "multiple manufacturer situation." The agency noted several types of manufacturers were involved, including manufacturers of the affected chemical, fiber, fabric, yarn, and garments.

Before such a clarification was issued, Judge Robert F. Chapman, in ruling on a motion for a permanent injunction in *Springs Mills, Inc. v. Consumer Product Safety Commission*, held that the CPSC ban on TRIS-treated materials was null and void because the CPSC had failed to follow the rule-making procedures required under the FHSA. 434 F.Supp. 416, 435 (D.S.C. 1977). Judge Chapman held that (1) the CPSC must follow the rule-making procedures set forth in the Food, Drug and Cosmetic Act, 21 U.S.C. § 371(e), to declare an article a "banned hazardous substance"; (2) even where children are involved, the CPSC must first find an article to be a "hazardous substance" before declaring it a "banned hazardous substance"; (3) action banning TRIS was not an "interpretative rule" or "statement of policy" within the exemption from rule-making provided by the Administrative Procedure Act; and (4) the CPSC's failure to follow the procedural safeguards of a full rule-making hearing deprived plaintiff of due process. On the basis of these findings, the court ruled that the § 1274 repurchase obligations could not be triggered until the CPSC had conducted a hearing to decide whether TRIS was a "hazardous substance" within the meaning of the Act. *Id.* at 435.

The CPSC, rather than attempting to ban TRIS through rule-making, on December 6, 1977, issued a "Statement of Policy" to the effect that the CPSC intended to enforce its belief that TRIS was a hazardous substance by bringing individual enforcement actions in federal courts "to prevent the sale and to require the statutory repurchase of such products."

---

**3.** On May 5, 1977, the CPSC published the court order in the Federal Register and expanded the ban. On May 12, the Court of Appeals for the District of Columbia stayed the district court order and the May 5 ban. On May 19, upon a Commission representation that it would take prompt and decisive action, the Court of Appeals lifted the stay and vacated the district court order.

In a separate action, the South Carolina district court on May 24, 1977, entered a preliminary injunction restraining the CPSC from applying or enforcing its TRIS regulations against Springs Mills, Inc. *See Springs Mills, Inc. v. CPSC, supra*, 434 F.Supp. at 418.

The CPSC then undertook to prohibit the sale of TRIS-treated material through the seizure procedures of 15 U.S.C. § 1265. This use of the seizure procedures, without prior agency rule-making, was upheld in *United States v. Articles of Hazardous Substance*, 588 F.2d 39, 42 (4th Cir. 1978), *rev'g* 444 F.Supp. 1260 (M.D.N.C.1978). The Fourth Circuit found that the hearing required by due process on the issue whether TRIS-treated material is a "banned hazardous substance" would take place in a subsequent hearing on the merits of the condemnation proceeding.

In the case at bar, Riegel repurchased from its customers TRIS-treated pajamas pursuant to the CPSC's April 8 "interpretation." Riegel in turn sought to have Celanese repurchase from Riegel. After negotiations with Celanese failed, Riegel filed this action in the Southern District of New York. The district court, William C. Conner, J., dismissed the complaint for failure to state a claim, holding that under the criteria set forth in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), neither § 1263 nor § 1274 of the Federal Hazardous Substances Act created an implied right of action. The court then dismissed plaintiff's seven state law claims, based on product liability, warranty and negligence, finding the exercise of pendent jurisdiction to be inappropriate. *Riegel Textile Corp. v. Celanese Corp.*, 493 F.Supp. 511 (S.D.N.Y. 1980).

## DISCUSSION

### A. Introduction

■ This case presents a question of first impression: whether a private right of action should be implied under sections 1263 or 1274 of the Federal Hazardous Substances Act.[4] *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. at 2087 (1975), establishes the criteria which must be examined to determine whether a private remedy is implicit in a statute not expressly providing one:

> First, is the plaintiff "one of the class for whose *especial* benefit the statute was enacted,"—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law? (Citations omitted.)

Recent Supreme Court decisions have stressed that courts should be reluctant to imply private rights of action. *See Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977).[5] "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). The *Cort* factors are not necessarily to be accorded equal weight. "The central inquiry remains whether Congress intended

---

4. The CPSC has filed an *amicus curiae* brief asserting that § 1274 creates a private right of action to enforce repurchase under the Act. The CPSC takes no position whether § 1263 implies a private right of action, or whether an implied right of action exists for other types of relief under § 1274. The Supreme Court, in *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 41 n.27, 97 S.Ct. 926, 949 n.27, 51 L.Ed.2d 124 (1977), indicated that the administrative deference rule, which allows the court to grant considerable deference to the interpretation of a statute by an agency charged with its administration, is of limited value where the narrow legal issue is whether a cause of action in favor of a particular class of litigants should be implied by judicial interpretation.

5. Judge Goldberg, dissenting in *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074, 1088 (5th Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 246, 66 L.Ed.2d 115 (1980), described the prevailing trend dramatically: "Only a cave dweller or other layman would not realize that there has been a remarkable change of attitude by the Supreme Court regarding the inference of private rights of action in the last fifteen years."

to create, either expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington, supra*, 442 U.S. at 575, 99 S.Ct. at 2489.

### B. The Statutory Scheme

Before proceeding to the analysis under *Cort v. Ash*, it is useful to outline the history of the relevant statutes. The Federal Hazardous Substances Labeling Act, 15 U.S.C. §§ 1261 *et seq.*, enacted in 1960, was essentially a labeling law and applied only to products packaged in containers intended for household use. The Act defined certain categories of "hazardous substances" and then prohibited their delivery and receipt in interstate commerce if "misbranded"; i. e., if they did not carry an appropriate warning label. Administration of the Act was vested in the Secretary of Health, Education and Welfare.

This Act was amended by the Child Protection Act of 1966, and the word "Labeling" deleted from its title. The coverage of the FHSA was extended to include any "hazardous substance" intended for household use or use by children. The 1966 amendments also permitted the administrative agency to ban from interstate commerce products which are so dangerous that no warnings could make the product safe for use.

Congress, finding inadequate the existing laws relating to toys, further amended the FHSA by the Child Protection and Toy Safety Act of 1969. The amendments were designed to provide protection to children from toys and other articles which are hazardous due to the presence of electrical, mechanical or thermal hazards. The 1969 amendments added a section requiring the repurchase of "banned hazardous sub-

stances" by manufacturers, distributors and dealers, including retailers. 15 U.S.C. § 1274.

In 1972, Congress enacted the Consumer Product Safety Act (CPSA), 15 U.S.C. §§ 2051 *et seq.*[6] This Act was an effort by Congress to do away with piecemeal legislative coverage and to consolidate within a single independent agency all federal safety-oriented regulation in the area of consumer products.[7]

The CPSA established a new regulatory agency, the Consumer Product Safety Commission, to administer the Act and transferred to the CPSC the responsibility for administering the Federal Hazardous Substances Act. 15 U.S.C. § 2079. Like the FHSA, the CPSA was primarily directed to developing safety standards, with a consumer product to be banned only if no safety standard could be devised which would adequately protect the public. 15 U.S.C. §§ 2057, 2058.

Section 2059 of the CPSA authorizes "interested persons," including consumers or consumer organizations, to petition the CPSC to commence a proceeding for the issuance, amendment, or revocation of a consumer product safety rule; that is, a consumer product safety standard or a rule declaring a consumer product a "banned hazardous product." The CPSC is authorized to conduct such investigations or proceedings as are appropriate, and is required, within 120 days after a petition is filed, either to grant or deny the petition. If the petition is granted, the CPSC is required to commence rule-making promptly; if denied, the reasons for the denial must be published in the *Federal Register*. Upon denial of the petition, the petitioner may commence an

6. The CPSA was based on the recommendations of a National Commission on Product Safety, established by Joint Resolution of Congress in 1967. The Commission's final report, published June 30, 1970, called for new legislation which would create a consumer product safety commission with broad powers to develop and set mandatory consumer product safety standards; to enforce the standards with civil and criminal sanctions as well as injunctive powers; to require notices of defect to consumers and the recall of dangerous products; to make inspections of manufacturing facilities to implement compliance; and to hold public hearings, with the power to subpoena witnesses and documents.

7. As originally proposed, the CPSA would have repealed much of the product safety legislation then in effect, including the FHSA. The bill that was enacted, however, left in effect this legislation "in order that there be no gap in coverage while new regulations, promulgated under the authority in Title III, are being developed over the next few years." Remarks of Sen. Percy, 118 Cong.Rec. 21851 (1972).

action in district court to compel the CPSC to initiate a proceeding to take the action requested. If, in a *de novo* proceeding, the court finds, by a preponderance of the evidence, (1) that the product presents an unreasonable risk of injury, and (2) that the CPSC's failure to initiate rule-making unreasonably exposes consumers to a risk of injury, the court is required to order the CPSC to initiate rule-making. Thus, the Act provides consumers with specific procedures to bring particular product hazards to the attention of the CPSC.

The CPSA also provides two express private remedies. Section 2072 provides for a suit by any person injured by a knowing violation of any Commission rule or order. Section 2073 provides for an injunctive action seeking to enforce any Commission rule or order.

## C. Implied Rights of Action

### 1. *Section 1263*

Section 1263 of the Federal Hazardous Substances Act provides, in relevant part, that:

[t]he following acts and the causing thereof are prohibited:

(a) the introduction or delivery for introduction into interstate commerce of any misbranded hazardous substance or banned hazardous substance.

Plaintiff argues that certain substances, including TRIS, are by definition "banned hazardous substances" under § 1261(q)(1)(A),[8] and thus no agency action defining the substance as such is required. Plaintiff argues that without a private right of action under § 1263, there would be a private remedy for products banned by agency action, *see* 15 U.S.C. § 2072,[9] but not for products banned by definition, without agency action. Therefore, a private right of action must necessarily be implied under § 1263 in order to fulfill the statutory purpose evidenced by the private remedy which § 2072 provides for violation of a prohibition established by CPSC rule or order.[10]

The threshold inquiry under *Cort v. Ash* is whether the plaintiff is one of the class for whose especial benefit the statute was

---

**8.** The term "banned hazardous substance" is defined by § 1261(q)(1) as:

(A) any toy, or other article intended for use by children, which is a hazardous substance, or which bears or contains a hazardous substance in such manner as to be susceptible of access by a child to whom such toy or other article is entrusted;

The term "hazardous substance" is defined in § 1261(f)(1)(A) as "[a]ny substance or mixture of substances which (i) is toxic ..., if such substance or mixture of substances may cause substantial personal injury or substantial illness ...." Section 1261(g) defines "toxic" as "any substance ... which has the capacity to produce personal injury or illness to man through ingestion, inhalation, or absorption through any body surface."

**9.** Section 2072 states:

(a) Any person who shall sustain injury by *reason of any knowing* (including willful) violation of a consumer product safety rule, or any other rule or order issued by the Commission may sue any person who knowingly (including willfully) violated any such rule or order in any district court of the United States in the district in which the defendant resides or is found or has an agent, [subject to the provisions of section 1331 of Title 28 as to the amount in controversy,] shall recover damages sustained, and may, if the court

determines it to be in the interest of justice, recover the costs of suit, including reasonable attorneys' fees, (determined in accordance with section 2059(e)(4) of this title) and reasonable expert witnesses fees[.]*: Provided, That the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, unless such action is brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity.*

Section 2072 was amended on December 1, 1980, by P.L. 96–486, the Federal Question Jurisdictional Amendments of 1980. The words in brackets were deleted by this amendment, and the *italicized words were added.*

**10.** The relationship between sections 1261 and 1263 is susceptible to confusion. Section 1261(q)(1)(A), which defines a "banned hazardous substance," does not "ban" or "prohibit" it from interstate commerce. Section 1263 actually bans or prohibits the substance from interstate commerce. Thus, plaintiff's argument that a private right of action exists for a violation of a "definitional prohibition" is premised on two subarguments. First, that a product can be, without agency action, defined as a "banned hazardous substance" under § 1261(q)(1)(A). Second, that a "banned hazardous substance" is, without agency action, prohibited from interstate commerce under § 1263.

enacted. Recent Supreme Court decisions make clear this question is answerable by looking to the language of the statute itself. *Cannon v. University of Chicago, supra,* 441 U.S. at 689, 99 S.Ct. at 1953; *see Transamerica Mortgage Advisors v. Lewis, supra,* 444 U.S. at 16, 100 S.Ct. at 245. By its terms, § 1263 does not provide a private judicial remedy to a party injured by the introduction into interstate commerce of a banned or misbranded hazardous substance. The language simply prohibits such introduction. Thus, the language of section 1263 contrasts markedly with that of other statutes which the Supreme Court has stated expressly identify the classes Congress intended to benefit. *See Cannon v. University of Chicago, supra,* 441 U.S. at 690 n.13, 99 S.Ct. at 1954 n.13. However, recognizing that there is no "talismanic incantation" necessary to create a private right of action, we note that other sections of the FHSA, particularly section 1261(q)(1), which

defines a "banned hazardous substance", evince an intent to benefit the buyers of household products, and especially children for whom toys are purchased. Riegel, however, is clearly not within such a class.[11] We therefore find the first *Cort* inquiry weighs against implying a private right of action under section 1263.

The second inquiry under *Cort* requires an examination of the legislative history to determine whether Congress intended either to create or deny a private remedy. *Cannon v. University of Chicago, supra,* 441 U.S. at 694, 99 S.Ct. at 1956. Recent cases state this inquiry is the most important.[12] *See Touche Ross & Co. v. Redington, supra,* 442 U.S. at 575, 99 S.Ct. at 2489.

The legislative history of the FHSA and the CPSA[13] offers little illumination on whether or not Congress intended to create a private right of action under section 1263.[14] The underlying purpose of these

Technically, in deciding whether a violation of section 1263 gives rise to a private cause of action, we need only address the second argument. However, we recognize that prohibition of a "banned hazardous substance" under section 1263 necessarily involves a determination that a product is a "banned hazardous substance" as defined in § 1261. Thus, we also address whether, for purposes of prohibition under § 1263, the § 1261 determination is left to the agency, or can be made by courts deciding suits between private parties.

11. In finding that Riegel is not within the class for whose especial benefit section 1263 was enacted, this court finds a similarity between the language of § 1263 and language for which the Supreme Court stated

there would be far less reason to infer a private remedy in favor of individual persons if Congress, instead of drafting ... with an unmistakable focus on the benefited class, had written it simply as a ban on discriminatory conduct ... or as a prohibition ....

*Cannon v. University of Chicago, supra,* 441 U.S. at 690–93 & n.14, 99 S.Ct. at 1954–1956 & n.14.

12. A negative answer to the "threshold" *Cort* inquiry may also answer the second inquiry. Once plaintiff is found not to be a member of the class for whose especial benefit the statute was enacted, Congressional intent not to create an implied right of action in favor of plaintiff may be inferred.

13. The Supreme Court has noted that later statutes may provide guidance in determining

legislative intent. *See Cannon v. University of Chicago, supra,* 441 U.S. at 686 n.7, 99 S.Ct. at 1952 n.7; *Rogers v. Frito-Lay, Inc., supra,* 611 F.2d at 1080.

14. *See Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 18, 100 S.Ct. 242, (1979) (silence in legislative history regarding implied action not surprising where no express action provided).

Some commentators have criticized as futile the search for evidence to determine if Congress contemplated resort to private actions without providing for such actions in the statute. *See* Comment, *Private Rights of Action under Amtrak and Ash: Some Implications for Implication,* 123 U.Pa.L.Rev. 1392, 1412 (1975); Note, *Implied Liability under the Securities Exchange Act,* 61 Harv.L.Rev. 858, 860 (1948). Further, evidence of intent found in legislative history is often equivocal or may not be conclusive of the general sentiment of Congress. As one court has warned:

Courts should avoid delving into "legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction."

*Potomac Passengers Ass'n v. Chesapeake & O. Ry.,* 475 F.2d 325, 335 (D.C.Cir.1973) (*quoting Gemsco, Inc. v. Walling,* 324 U.S. 244, 260, 65 S.Ct. 605, 614, 89 L.Ed.2d 921 (1945)), *rev'd sub nom., National R. R. Passenger Corp. v. National Ass'n of R. R. Passengers,* 414 U.S. 453, 94 S.Ct. 690, 38 L.Ed.2d 646 (1974).

Acts, as indicated by their history, was to achieve nationwide uniformity in the regulation of certain hazardous products. To this end, the emphasis of the FHSA and the CPSA was preventive, not remedial. The Acts focus on the prevention of injury, and not the recompense of injury after it has occurred. To fulfill this purpose, Congress created the CPSC as an independent regulatory agency, giving it primary responsibility for enforcement of the statutes, and provided limited private remedies for situations in which the CPSC fails to act upon or denies a petition, or when a rule or order of the CPSC is violated.

The history of the Acts demonstrates Congress' intent that the FHSA enforcement provisions parallel those of the Food, Drug and Cosmetic Act. Section 1263, which specifies that certain acts are prohibited, is "largely patterned after the corresponding section of the Federal Food, Drug and Cosmetic Act." H.R.Rep.No.1861, 86th Cong., 2d Sess. (1960), *reprinted in* [1960] U.S.Code Cong. & Ad.News 2833, 2840. The FHSA, as originally enacted, focused on the labeling of certain products, with enforcement solely through agency action, as in the Food, Drug and Cosmetic Act. In expanding the FHSA to allow for a direct ban on certain products where a cautionary label would not suffice to protect consumers, the legislative history does not indicate a change in the Congressional intent that enforcement be by the agency.

The third *Cort* inquiry is whether a private cause of action is "consistent with the underlying purposes of the legislative scheme." To be sure, implication of a private right of action would provide an additional enforcement tool; however, it is not our role to legislate. "The ultimate question is one of congressional intent, not one of whether this Court thinks it can improve upon the statutory scheme that Congress enacted into law." *Touche Ross & Co. v. Redington, supra,* 442 U.S. at 578, 99 S.Ct. at 2490; *Rogers v. Frito-Lay, Inc.,* 611 F.2d 1074, 1085 (5th Cir.), *cert. denied,* —— U.S. —— 101 S.Ct. 246, 66 L.Ed.2d 115 (1980) ("To determine the message to be found in the void of express Congressional state-

ment, we resort neither to our own notions of sound policy nor to our concept of what best suits the public weal.").

The Federal Hazardous Substances Act and the Consumer Product Safety Act contain a comprehensive set of administrative and judicial remedies. Section 1264 provides for criminal penalties for violation of the FHSA. Section 1265 provides for a seizure action, and section 1267 provides for injunctive proceedings. Section 1268 provides that all criminal, seizure and injunctive actions be brought "by and in the name of the United States." Section 2059 provides for petitions to the CPSC for a product safety rule, and for a civil action if the CPSC fails to act on or denies the petition. Section 2069 grants the CPSC the authority to proceed administratively for the purpose of assessing civil penalties. *Advance Machine Co. v. Consumer Product Safety Commission,* 3–80 Civ. 372 (D.Minn. March 6, 1981). Section 2070 provides for criminal penalties for violation of the CPSA, and section 2071 provides for injunctive enforcement and seizure actions under the CPSA. Section 2072 provides for private suits for damages due to the violation of any CPSC rule or order. Section 2073 provides for private suits to enforce any CPSC rule or order by injunction.

The Acts give the CPSC a broad range of enforcement powers to implement the statutory purposes. Implicit in this enforcement scheme is the need of the CPSC to evaluate the exercise of its enforcement power in light of a broad range of policy considerations, particularly the development of a coordinated regulatory program. Because litigants in pursuit of a private remedy are unconstrained by institutional policies of uniformity, they could, by instituting multiple lawsuits, undermine the Acts' goal of a coordinated regulatory program. Private litigation could deprive the CPSC of an opportunity to build upon the foundation provided by the FHSA and the CPSA in establishing a sound and strong federal regulatory policy governing hazardous substances. Specifically, such litigation would diminish the discretion of the CPSC

to decide whether a substance can be made safe merely through cautionary labeling or must be banned from the marketplace. Thus, we conclude that the agency should determine whether a substance is a "banned hazardous substance" for purposes of prohibition under section 1263.

As was stated by this circuit in denying a private right of action under section 404(b) of the Federal Aviation Act, 49 U.S.C. § 1374(b):

> The implication of a private right to sue for damages does not inevitably complement the work of the agency charged by Congress with the enforcement of a statute. Private litigation tends to transfer regulatory interpretation and discretion from the agency to the courts, which are ill-equipped to undertake the burdens thus imposed upon them. Inconsistency in enforcement may well ensue. Moreover, the deterrent effect of damage litigation is largely incidental, and Congress may conclude that statutory compliance will be better achieved by more efficient and less expensive means.

*Caceres Agency, Inc. v. Trans World Airways, Inc.*, 594 F.2d 932, 934 (2d Cir. 1979) (citations omitted).

We note that "over the last decade rulemaking has been increasingly substituted for adjudication as a regulatory technique, with the support and encouragement of courts, at least where the regulation involves specialized scientific knowledge." *National Nutritional Foods Association v. Weinberger*, 512 F.2d 688, 698 (2d Cir.), *cert. denied*, 423 U.S. 827, 96 S.Ct. 44, 46 L.Ed.2d 445 (1975); *see NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969); *National Association of Pharmaceutical Manufacturers and National Pharmaceutical Alliance v. Food and Drug Administration*, 637 F.2d 877, at 881 (2d Cir. 1981). This preference for rulemaking results from a recognition of the value of agency expertise. Here, regulation of hazardous substances is a subject which benefits greatly from the specialized knowledge of the CPSC by virtue of its sophistication and experience in this area. As this circuit has pointed out:

> the case-by-case adversary proceeding . . . has frequently proved to be an unsuitable method of enforcing the law, since it often resolves narrow issues of importance only to the immediate adversaries rather than broad questions of interest to the industry or the public. The rule-making proceeding, on the other hand, provides the agency with an opportunity first to receive a wide spectrum of views proffered by all segments affected by the proposed rule (e. g., manufacturers, vendors, . . . consumers) and then in a legislative fashion to consider and choose from several alternatives or options rather than limit its decisions to narrow issues controlling a particular case.

*National Nutritional Foods Association v. Weinberger, supra*, 512 F.2d at 698.

Moreover, implying a private right of action under § 1263 would be inconsistent with the statutory scheme as evidenced by sections 2058, 2072 and 2073. A suit directly under section 1263 would allow a consumer to bypass the CPSC, a result not intended by Congress in light of the detailed consumer petition provisions of section 2058 and the private remedies under sections 2072 and 2073 for failure to comply with a CPSC rule or order.

Recently, Congress amended 28 U.S.C. § 1331 to eliminate the $10,000 amount in controversy requirement for all cases "aris[ing] under the Constitution, laws, or treaties of the United States." However, Congress specifically retained the $10,000 amount in controversy requirement for suits under § 2072. *See* note 9 *supra*. Implying a private right of action under § 1263 may allow plaintiff to defeat this jurisdictional requirement, thus frustrating the intent of Congress that only private damage suits under the CPSA which involve more than $10,000 in controversy be litigated in federal court.

Finally, under the fourth *Cort* inquiry, plaintiff's claims, grounded in product liability, negligence and breach of warranty, are traditionally the concern of state law. Plaintiff's state remedies are no less viable

because the products may also be regulated under the FHSA or the CPSA. *See* 15 U.S.C. § 2072(b). Nor will relegation of plaintiff to state law remedies frustrate any statutory purpose or national interest. *Compare J. I. Case v. Borak*, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964) (private cause of actions implied when relegating the litigants to a state remedy would frustrate the purpose of § 14(a) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78n(a)). Therefore, the fourth *Cort* factor militates against implying a private cause of action under section 1263.[15]

■ Thus, under the *Cort* analysis, we conclude that it would be inappropriate to imply a private right of action under § 1263 in favor of plaintiff.

### 2. *Section 1274*

Plaintiff also argues that a private right of action should be implied under section 1274 to compel defendant to repurchase the TRIS-treated material sold to plaintiff.

Section 1274 provides, in relevant part, that:

(a) In the case of any article or substance sold by its manufacturer, distributor, or dealer which is a banned hazardous substance (whether or not it was such at the time of its sale), such article or substance shall, in accordance with regulations of the Secretary, be repurchased as follows:

(1) The manufacturer of any such article or substance shall repurchase it from the person to whom he sold it . . . .

(2) The distributor of any such article or substance shall repurchase it from the person to whom he sold it . . . .

(3) In the case of any such article or substance sold at retail by a dealer, if the person who purchased it from the dealer returns it to him, the dealer shall refund the purchaser the purchase price paid for it and reimburse him for any reasonable and necessary transportation charges incurred in its return.

\*   \*   \*   \*   \*   \*

In deciding whether a private party can proceed directly under section 1274 to enforce repurchase, much of the analysis of whether a private cause of action should be implied under section 1263 is also applicable here.[16]

Plaintiff is a member of the class for whose especial benefit section 1274 was enacted. In enacting this section, Congress was primarily concerned with the allocation of the economic burden which would result

---

**15.** Plaintiff relies on three cases to support its claim that § 1263 implies a private right of action. In *Cross v. Board of Supervisors*, 326 F.Supp. 634, 638 (N.D.Cal.1968), *aff'd on opinion below*, 442 F.2d 362 (9th Cir. 1971), the court, although stating that civil recovery "may be applied under appropriate circumstances," dismissed the complaint because plaintiff had failed to show any damages. In *Fine v. Philip Morris, Inc.*, 239 F.Supp. 361, 363 (S.D.N.Y. 1964), the court, on a motion to remand to state court, retained jurisdiction over a hazardous substances claim, stating that "[t]here is . . . no need to determine on this motion whether the Act, properly construed, does or does not give rise to a private right of action for its violation." In *Meredith v. Glamorene Products Corp.*, 55 F.R.D. 397 (E.D.Wis.1972) the court assumed, but did not discuss, its jurisdiction under the Federal Hazardous Substances Act, in deciding a summary judgment motion on statute of limitation grounds. The court below correctly found these cases not dispositive of the issue because they did not consider the issue at length and/or explicitly in

terms of the *Cort v. Ash* standard. *See also Lasker v. Burks*, 441 U.S. 471, 476 n.5, 99 S.Ct. 1831, 1836 n.5, 60 L.Ed.2d 404 (1977) ("question whether a cause of action exists is not a question of jurisdiction, and therefore may be assumed without being decided").

**16.** Central to our holding that implication of a private cause of action under section 1263(a) is inappropriate is our conclusion that for purposes of that section, the agency, rather than courts hearing suits between private parties, should determine whether a substance is a "banned hazardous substance." Section 1274, by its terms, is similar to section 1263(a) in that it comes into effect only upon a determination that a product contains a "banned hazardous substance." Therefore, the same reasons that persuade us to conclude that the agency should make this determination for purposes of prohibition under section 1263(a), persuade us to find that the agency also should make this determination for purposes of repurchase under section 1274. *See* note 10 *supra*.

from the banning of a product.[17] Congress intended that the party responsible for introducing the product into commerce bear the ultimate loss, thus providing an incentive to manufacturers to produce safe goods.

Unlike section 1263, section 1274 is not a general prohibition of conduct. Rather, this section sets forth the chain of repurchase to be followed once a product is determined to be a "banned hazardous substance." Thus, section 1274 specifies a well-defined class of persons to which it applies. Plaintiff, by falling within this chain of repurchase, is therefore a member of the class for whose benefit the statute was enacted.

We turn next to a determination whether Congress intended to create or deny a private remedy. The legislative history of section 1274 indicates the concern of Congress regarding "who should bear the cost for the losses incurred by the removal of those defective products which happen to get into the stream of commerce before they are detected." Remarks of Senator Prouty, 115 Cong.Rec. 17761 (1969).

Plaintiff argues that the following statements evidence an intent on the part of Congress to create a private right of action.

The bill also provides that in the case of a banned item, the manufacturer would have to repurchase the items from the retailers. This protects the retail store owner from being stuck with unsellable stock, and places the loss where it properly belongs—on the manufacturer of the dangerous toy.

Remarks of Rep. Keith, 115 Cong.Rec. 24347 (1969).

Another feature of this bill which should have a dampening effect on those who would knowingly sell dangerous products is the requirement for repurchase. It starts at the top and extends down to the ultimate purchaser. The buyer of the article may return it to his retailer who must repurchase it. The retailer then may do the same with his distributor, who may in turn make his appropriate claim on the manufacturer.

Remarks of Rep. Springer, 115 Cong.Rec. 24347 (1969). These statements, and those of Senator Prouty,[18] do no more than point out the scope of the repurchase obligation.

Although the scope of the repurchase obligation is clear, the legislative history does not indicate who may enforce this provision. As originally proposed, section 1274 appears

---

**17.** While the legislative history speaks of the repurchase provision as it will benefit toy retailers, see remarks of Sen. Scott, 115 Cong. Rec. 20808 (1969), the House report states that "[t]he amendments made by this section are not limited to children's articles. These amendments add a new section to the Act ...." H.R.Rep.No. 91–389, 91st Cong., 1st Sess. (1969) reprinted in [1969] U.S.Code Cong. & Ad.News 1231, 1240.

**18.** "During the course of the [committee] hearings it became clear to me that the bill as originally written contained one serious defect. That defect became apparent when we considered what could happen if an unsafe toy somehow got into the stream of commerce and had to be recalled. Both the bill as originally written and the amended version provide that should an unsafe toy get to the marketplace, it can be seized by the Government so as to protect innocent consumers from the hazard which it poses.

In the original bill, however, the monetary loss from such a seizure would have fallen upon the party who had the product at the time of the seizure. In other words, if an unsafe toy

happened to be on the store shelf at the time the defect was discovered, the local retail merchant would have suffered the economic loss unless the wholesaler or manufacturer had voluntarily agreed to compensate him for the loss.

Mr. President, I, personally, felt that this was an inequity in the original bill. Therefore, I proposed an amendment to the bill which presently is contained in section 4. That amendment places the liability for economic loss, because of the recall of an unsafe toy, upon the manufacturer of the toy. I believe this amendment will not only benefit local retail stores but will also benefit American toy manufacturers. In the unlikely event that an unsafe toy sometime in the future gets into the stream of commerce, the retail store will know that the American manufacturer is bound by law to return the retailer's purchase price for the particular toy which is on sale. However, this law has no extraterritorial effect, so a retail store which purchases a foreign toy takes a risk that if the toy is found unsafe, he may have to suffer the economic loss."
115 Cong.Rec. 17761 (1969).

to have been self-executing, such that it would take effect "immediately" upon a finding by the secretary that an article was a "banned hazardous substance."[19] In enacting section 1274, however, Congress deleted the word "immediately" and provided that repurchase be "in accordance with regulations of the secretary." While no reason is stated for the change, given the complexity of relationships between manufacturers, distributors, and retailers, it appears Congress believed a self-executing repurchase provision would prove unworkable. Thus, Congress intended that the repurchase obligation be initiated only upon action by the Secretary. This is wholly consistent with the statutory purpose that enforcement of the Acts commence with agency action. Congress intended that the agency responsible for determining whether a substance is hazardous and enforcing any ban, would also define and order any repurchase.

Moreover, in sections 2072 and 2073 Congress expressly provided private parties with the right to sue in federal court once a CPSC order requiring repurchase is violated. Thus, the existence of private suits under sections 2072 and 2073 and the change in the language of section 1274 indicate an intent to deny direct suits under section 1274.

Plaintiff suggests a number of policy reasons to support its argument that a private right of action under § 1274 is consistent with the underlying purpose of the legislative scheme. Plaintiff argues that a private remedy will encourage a manufacturer to comply with its obligation to repurchase, deter the sale of dangerous products by making it unprofitable to do so, and place the economic loss on the party responsible for its introduction into commerce. How-

ever, these goals can be accomplished through the express remedies of the FHSA and the CPSA. The commission's criminal, civil penalty, seizure, and injunctive powers, the consumer petition provisions, as well as the private remedy and injunctive provisions for a knowing violation of a CPSC rule or order all serve to encourage repurchase, to deter the sale of dangerous products, and to place the economic loss on the responsible party. Moreover, private actions directly under section 1274 may lead to the imposition of inconsistent repurchase obligations.

Plaintiff also asserts the CPSC's limited resources make necessary a private remedy under § 1274 because "it would be impossible for the CPSC to commence enough suits on behalf of private parties to enforce this section in a fair or consistent manner." This section, however, can be enforced by private parties under sections 2072 and 2073 once the CPSC issues a rule or order finding a product to be a "banned hazardous substance" and orders repurchase. And, as Judge Mulligan has stated:

> Whatever force this argument might once have had, see *J. I. Case Co. v. Borak, supra*, 377 U.S. at 432, 84 S.Ct. 1555, [at 1559] is seriously undermined by the Court's observation in *Piper* that "institutional limitations alone do not lead to the conclusion that any party ... should have a cause of action for damages." 430 U.S. at 41, 97 S.Ct. at 949. The argument that a regulatory agency is confessedly unable properly to regulate ... as charged by Congress and detailed by its own regulations, and that therefore the federal courts should find a damage remedy implicit in an act which studiously avoided giving one to the class sought to

---

**19.** As originally proposed, Section 4 [1274] of the Senate bill read:

> Section 2(q) of such Act (15 U.S.C. 1261(q)) is amended by adding at the end thereof the following:
> "(3) If any substance or article is determined to be a banned hazardous substance after the sale of such substance or article by a manufacturer or a distributor to a distributor or a dealer and prior to the sale of such substance or article by such dealer or distributor, the

> distributor shall immediately repurchase such substance or article at the price paid by such dealer, plus the transportation charges involved, and the manufacture [*sic*] shall immediately repurchase from the distributor (or from the dealer if there is no distributor) such substance or article unsold or repurchased at the price paid, plus all transportation charges involved."

115 Cong.Rec. 24356 (1969).

be represented here, is simply unpersuasive.

*Redington v. Touche Ross & Co.*, 592 F.2d 617, 633–34 (2d Cir. 1978) (Mulligan, J., dissenting), *rev'd*, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (footnote omitted). Therefore, private suits under section 1274 to enforce repurchase would be inconsistent with the statutory scheme.

The analysis of the fourth *Cort* inquiry under section 1263 is equally applicable here. Plaintiff's claims are of the type traditionally the concern of state law.

Finally, when Congress has intended that there be private enforcement of a repurchase provision, it has explicitly so stated. For example, in the National Traffic and Motor Vehicle Safety Act of 1966, 15 U.S.C. §§ 1381 *et seq.*, Congress explicitly provided distributors and dealers with a private right of action if a manufacturer or distributor refused to comply with the repurchase or repair provisions of the Act. *See* 15 U.S.C. § 1400(b).[20]

■ Thus, under the *Cort* analysis, we conclude that it would be inappropriate to imply a private right of action under § 1274.

## D. Pendent Jurisdiction

The court below, having concluded that plaintiff had no private right of action under the Federal Hazardous Substances Act, correctly dismissed the plaintiff's state law claims. Without a surviving federal claim, pendent jurisdiction cannot be relied upon to sustain federal jurisdiction over state claims. *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1015 (2d Cir. 1975); *see United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966).

The judgment of the district court is affirmed.

---

**20.** Section 1400(b) provides in relevant part:

In the event any manufacturer or distributor shall refuse to comply with the requirements of paragraphs (1) [requiring repurchase] and (2) [requiring necessary parts to be provided] of subsection (a) of this section, then the distributor or dealer, as the case may be, to whom such nonconforming vehicle or equip-

ment has been sold may bring suit against such manufacturer or distributor in any district court of the United States ... without respect to the amount in controversy, and shall recover the damage by him sustained, as well as all court costs plus reasonable attorneys' fees.