NYASCO SPORTS, INC., Plaintiff,

v.

DIRECTOR, FEDERAL EMERGENCY MANAGEMENT AGENCY, et al., Defendants.

No. 80 Civ. 6295 (DBB).

United States District Court, S.D. New York.

March 30, 1983.

Mordkofsky & Goldstein, P.C., Bronx, N.Y., by Norman J. Mordkofsky, New York City, for plaintiff.

John S. Martin, Jr., U.S. Atty., S.D.N.Y., for defendant Director, Federal Emergency Management Agency; Richard A. Simpson, Asst. U.S. Atty., New York City, of counsel.

Ginsberg & Caesar, P.C., by Linda A. Mango, New York City, for defendant American Federal Group, Ltd.

## MEMORANDUM

BONSAL, District Judge.

Plaintiff Nyasco Sports, Inc. ("Nyasco") brought this action to recover the proceeds

of two insurance policies, one issued by defendant Director of the Federal Emergency Management Agency [1] ("the federal defendant" or "the government") and one issued by defendant American Federal Group, Ltd. ("the private defendant"). Nyasco seeks a total of $30,000 under the first policy and $45,000 under the second, for losses allegedly sustained in two burglaries said to have occurred on July 13 and July 16, 1979. Jurisdiction over the federal defendant is based on 12 U.S.C. § 1749bbb–11, the jurisdictional portion of the Federal Crime Insurance Program, 12 U.S.C. §§ 1749bbb–10a, *et seq.,* pursuant to which the first policy was issued. Jurisdiction over the private defendant is alleged to exist under Rule 18 of the Federal Rules of Civil Procedure and the doctrines of ancillary and pendent jurisdiction.

Trial of this action was originally scheduled to begin December 14, 1982. Prior to trial, the federal defendant filed a Memorandum of Law raising two defenses to Nyasco's action: (1) that Nyasco misrepresented its gross receipts on its application for federal crime insurance; and (2) that Nyasco failed to submit a detailed, sworn proof of loss within sixty days after each of the alleged burglaries. The court determined that the federal defendant's memorandum should be treated as a motion to dismiss Nyasco's claims against it, and an evidentiary hearing was held on December 14 and 15, 1982 for the purpose of eliciting the relevant facts.[2] Following the hearing, both Nyasco and the federal defendant filed further memoranda of law.[3]

For the reasons stated below, the federal defendant's motion to dismiss Nyasco's federal claims is granted. In view of this, the court does not have pendent jurisdiction over Nyasco's state claims against the private defendant. Therefore, these claims are dismissed without prejudice.

## BACKGROUND

The following facts relevant to this motion emerged from the testimony given at the hearing. Nyasco was founded in January, 1979 by Monroe Messinger, its current president and sole stockholder, for the purpose of selling athletic shoes. Messinger testified that the company sells at both the retail and wholesale levels, "to any type of source we can get." Transcript at 92 (hereinafter, "Tr. at ____"). Messinger has been self-employed as a seller of sporting goods since 1945. He has been affiliated with a business called New York Athletic Supply Co. since 1950 and became its sole owner in 1979. New York Athletic Supply is also engaged in selling athletic shoes and has the same address as Nyasco, at 301 East 149th Street in The Bronx. Messinger was admitted to the New York bar in 1959 and has practiced law part-time since then.

In March, 1979 Nyasco applied for a commercial crime insurance policy under the Federal Crime Insurance Program. The application, a standard form issued by the Federal Insurance Administration, was prepared with the help of Nyasco's broker, Alliance Brokerage Corp., and was signed by Messinger. Under "PREMIUM COMPUTATION" the form states: "Annual gross receipts for preceding year as shown on most recent tax return. If new business with no previous tax return, estimate annual gross receipts." In the box next to this on Nyasco's application, the figure "$50,000" appears. The policy was effective for one year beginning March 17, 1979, the date on which Messinger signed the application.

---

1. Nyasco's complaint names Patricia Harris, then Secretary of the Department of Housing and Urban Development, as a defendant. By stipulation and order dated December 15, 1982, the parties agreed to the substitution of the Director, Federal Emergency Management Agency as a party defendant in place of Samuel Pierce, the current Secretary of Housing and Urban Development.

2. The court stated that the proceedings would not be binding on the private defendant, which has asserted its right to a jury trial on Nyasco's claims against it.

3. Since the court only requested one memorandum of law from each party, the federal defendant's reply memorandum was not considered in disposing of this motion.

On arriving for work on Friday, July 13, 1979, Messinger discovered that Nyasco's premises had been burglarized. An inspection of the building by the police revealed that three doors to the building's basement had been pried open. An iron worker hired by Messinger to repair the doors was only able to finish repairing two of them before the end of the day and planned to return the following Monday to complete the job. However, early in the morning of July 16 an anonymous call alerted the police to a burglary in progress at Nyasco's premises. According to the police officer who investigated the scene, a cellar door—apparently the one which had not yet been fixed—had again been pried open. On both July 13 and 16 Messinger noticed that merchandise was missing from the storage area in the basement and called Alliance Brokerage to inform them of the losses.

About two weeks later, a private *adjustor* named Robert Calabro visited Nyasco on behalf of the federal defendant. After speaking to Messinger about the two burglaries, Calabro wrote out a statement describing in part what had happened. Messinger then signed the statement, which is dated "7/31/79". Messinger also gave Calabro two handwritten documents, prepared by Nyasco's bookkeeper, which purported to list the goods stolen and their value. The total value of the shoes taken in the first burglary was alleged to be $45,090, and the total value of those taken in the second burglary was alleged to be $46,983. Messinger never showed these documents to Alliance Brokerage, but did send them two "inventory lists" dated July 13 and July 16. There was no testimony indicating what action Alliance Brokerage took on behalf of Nyasco following the alleged burglaries, but it is undisputed that neither Nyasco nor its broker filed a formal proof of loss in connection with the burglaries.

## DISCUSSION

### I.

Under 12 U.S.C. § 1749bbb–10a(b), "[federal crime] insurance shall be provided upon such terms and conditions, and subject to such deductibles and other restrictions and limitations, as the Secretary deems appropriate ...." The federal defendant's motion to dismiss is based on Nyasco's alleged failure to comply with two "restrictions and limitations" set forth in the regulations of the Federal Insurance Administrator at 44 C.F.R. §§ 80.1, *et seq.*[4]

### A.

The federal defendant's first contention is that Nyasco misrepresented its gross receipts on its application for a federal crime insurance policy. The governing regulations provide that:

> Notwithstanding any unqualified cancellation provisions contained in the prescribed policy forms, the insurer hereby limits his right to cancel, or to refuse to renew coverage, to the following grounds: ... (2) fraud or misrepresentation in the application or upon any renewal of coverage, or in connection with either .... Cancellation on any of the grounds in paragraph (d)(2), (3), or (4) of this section may, at the discretion of the insurer, be made retroactive to the date of the first known wrongful act.

44 C.F.R. § 81.7(d). The application for federal crime insurance required Nyasco, as a "new business with no previous tax return," to "estimate annual gross receipts." According to the federal defendant, the estimate of $50,000 provided by Nyasco misrepresented the gross receipts it actually should have anticipated, and thus denial of insurance coverage for Nyasco's losses was proper.

▪ Misstatement of gross receipts on an application for federal crime insurance clearly constitutes a material misrepresen-

---

4. The federal defendant contends in its Post-Hearing Memorandum of Law that Nyasco is also barred from recovery because its books do not substantiate the losses it allegedly suffered. However, because the hearings were aimed only at eliciting testimony concerning the two claims discussed *infra* (see Tr. at 37), and because resolution of this third claim is not necessary to a decision in this case, the court has chosen not to address it in this opinion.

tation warranting disclaimer of the policy. *Chalom & Son, Inc. v. St. Paul Fire & Marine Insurance Co.,* 285 F.2d 909, 910–11 (2d Cir.1961) (*per curiam*); *Finast Industrial Uniform Specialist, Inc. v. McConnell,* No. 81 Civ. 2878 (Mar. 18, 1982, S.D.N.Y.); *Almani Jewelry Corp. v. Federal Crime Insurance Program,* No. 80 Civ. 5091 (May 20, 1981, S.D.N.Y.); *Dunwell Knitwear Co. v. Federal Insurance Administration,* No. 78–C–108 (Jan. 23, 1979, E.D.N.Y.). Since the amount of gross receipts controls the size of the premium which the applicant must pay, misrepresentation of that amount enables an applicant to pay a smaller premium. Since the policy would not have been issued at the lower premium level if the insurer had known the true amount of the applicant's gross receipts, such misrepresentation is material. *E.g., Chalom, supra.*[5]

■ In previous cases involving the Federal Crime Insurance Program, the government's claim of misrepresentation was based on the fact that the statement of gross receipts on the application was lower than the same figure on the insured's most recent tax return. *E.g., Finast, supra; Almani, supra.* Here, the government asserts that Nyasco's *estimate* of gross receipts for its first year of business constituted misrepresentation. The government argues that Nyasco failed to make a good faith effort to provide a fair and reasonable estimate of its anticipated gross receipts. The evidence shows that its actual gross receipts for 1979 were either $433,209, according to its 1980 application for federal crime insurance, or

$393,289.07, according to its 1979 tax return.

At the hearing Messinger admitted signing the application but testified that he did not know who had written "$50,000" in the space provided for gross receipts. He also testified that he had no recollection of how that figure was computed. Tr. at 137–38. However, he was aware of "how the premiums were arrived at.". Tr. at 137.[6] Furthermore, by signing the application Messinger certified that "the statements in the Application [were] his agreements and representations." 44 C.F.R. § 83.26(b), ¶ 15. In any event, the testimony of Robert Mintz, an employee of Alliance Brokerage who handled Nyasco's account, indicates that the $50,000 estimate most likely was suggested by someone at Nyasco. Mintz testified that his "practice" in such cases would be to "call the insured to ask him what he anticipates the estimated receipts to be." Tr. at 272.

Several factors point to the conclusion that the $50,000 estimate given by Nyasco misrepresented the gross receipts which the company should have anticipated. First, the value of purchases made by Nyasco prior to Messinger's signing of the application suggests that Messinger knew at that time that Nyasco would gross well over $50,000 in 1979. By March 17, 1979, the date on which Messinger signed the application, Nyasco had purchased $36,653.41 worth of athletic shoes. Tr. at 234.[7] The value of purchases made immediately following the signing of the application further demonstrates Nyasco's high expecta-

---

5. The cases cited by Nyasco for the proposition that an insurer must prove the existence of five elements in order to establish fraud on the part of the insured are inapposite. As the government correctly points out, federal law is controlling on the issue of its liability under the terms of a federal crime insurance policy. The only federal case cited by Nyasco, *Mallis v. Bankers Trust Co.,* 615 F.2d 68 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981), concerns securities fraud and has no bearing on this case.

6. Messinger also testified that he thought the premium was recomputed every six months based on information provided by the insured concerning actual gross receipts. Tr. at 200–

201. However, while Nyasco suggests that this testimony helps establish Messinger's good faith in making an original estimate of $50,000, it is at best inconclusive. No evidence was presented that Nyasco in fact provided the federal defendant with a revised estimate of its annual gross receipts six months after the instant policy took effect.

7. According to Nyasco, by this same date it had no cash receipts and something less than $20,000 in credit receipts. This statement, if true, does not make the evidence of Nyasco's substantial purchases in the same period any less probative on the issue of its anticipated gross receipts *for the year.*

tions. By April 17, 1979, Nyasco had purchased a total of $155,174.26 worth of shoes. Tr. at 235. By July 13, the date of the first burglary, Nyasco's purchases for the year totalled $272,738, and by July 16, the date of the second burglary, they totalled $307,700. Tr. at 150, 154.

Testimony at the hearing revealed that up to $175,000 of these purchases was for Puma shoes. Nyasco's witnesses claimed that such a large order of one brand of shoes was highly unusual, motivated in this case by an impending shortage of Pumas available at wholesale in the northeast. Accepting the truth of this contention, Nyasco's large purchases of Puma shoes nevertheless support the view that it anticipated gross revenues in excess of $50,000 for 1979. Messinger himself testified that the shortage was to have lasted "possibly a year" (Tr. at 101) and the regional credit manager for Beconta, Inc., which sold the Pumas to Nyasco, testified that the number of shoes purchased was "about a year's supply." Tr. at 80. It thus seems likely that Nyasco planned to sell all of these shoes within a year.

Second, Messinger's considerable experience selling sporting goods gave him a sufficient basis for estimating Nyasco's future revenues with reasonable accuracy. It is undisputed that Messinger has been self-employed in the industry since 1945 and has helped operate another company also engaged in selling athletic shoes since 1950. That company, New York Athletic Supply, had gross receipts of "approximately seven or eight hundred thousand dollars" in 1978. Tr. at 90. Nyasco's attempt to differentiate the two businesses by claiming that Nyasco was formed to sell shoes to flea markets, "a brand new venture" (Tr. at 97), is not persuasive. Messinger testified that Nyasco also planned to sell to retail stores and at the wholesale level. Tr. at 98–99. In light of Messinger's past record in a closely-related and apparently very successful business, the $50,000 estimate on Nyasco's application appears to be unreasonably low.

Finally, the value of the insurance policies purchased by Nyasco itself suggests that the company expected more than $50,000 in annual gross receipts. Nyasco's federal crime insurance policy provided coverage of $15,000 per burglary, while the policy it purchased from the private defendant provided coverage of $25,000 per burglary. According to one of the witnesses at the hearing, turnover in the sale of athletic shoes is about four or five times a year. Thus, total insurance coverage of $40,000 per theft would seem unnecessary for a business contemplating only $50,000 in gross receipts for the entire year.

In sum, the evidence indicates that Nyasco failed to make a good faith, reasonable estimate of its gross receipts for 1979 on its application for federal crime insurance. This failure constituted misrepresentation, justifying the federal defendant's denial of coverage under 44 C.F.R. § 81.7(d).

### B.

The second ground advanced by the federal defendant for its motion to dismiss is Nyasco's failure to file a detailed, sworn proof of loss within sixty days after each burglary. By regulation, the insurance policy held by Nyasco included the following clause:

> *Insured's duties when loss occurs.* Upon knowledge of discovery of loss or of an occurrence which may give rise to a claim for loss, the insured shall: (a) Give notice thereof as soon as practicable to law enforcement authorities and to the insurer through any of its authorized agents, and (b) file detailed proof of loss, duly sworn to, with the Insurer through its authorized agents within sixty (60) days after the discovery of loss.

*See* 44 C.F.R. § 83.26(b), ¶ 6. The federal defendant contends that, since Nyasco did not submit a formal proof of loss in connection with the thefts that allegedly occurred on July 13 and 16, 1979, it is barred from recovering under its federal crime insurance policy.

Nyasco argues that the statement dated July 31, 1979 and written by Calabro, the

adjustor who visited Nyasco's premises, constitutes a valid proof of loss. The statement describes in general terms the nature of Nyasco's business and the circumstances surrounding the first burglary.[8] However, it does not satisfy the proof of loss requirement in Nyasco's insurance policy for two reasons. First, in spite of Nyasco's claims to the contrary in its memorandum of law, it is clear from its face that the statement was not sworn to. Nyasco's counsel conceded as much during a conference preceding the hearing. Tr. at 18. Second, the information contained in the statement is inadequate. The statement only refers to one of the two burglaries and, as to that one, does not provide all of the "pertinent information" called for by the regulations governing "how to report claims":

> including a description of the loss, time, place, ownership, manner of acquisition, cost, depreciation, current value, amount of claims, and whether the insured had incurred previous losses under the policy.

44 C.F.R. § 81.6.

Nevertheless, Nyasco contends that, because Calabro was also given two handwritten documents purporting to list the goods stolen and their value, the government was aware of the extent of Nyasco's alleged losses and should be estopped from denying recovery for them. In general, "where the insurer is an agency of the United States[,] procedural requirements must be strictly complied with." *Cross Queen, Inc. v. Director, FEMA,* 516 F.Supp. 806, 809 (D.V.I.1980). In denying a claim of estoppel against the federal government, the Supreme Court recently reaffirmed "the duty of all courts to observe the conditions defined by Congress for charging the public treasury." *Schweiker v. Hansen,* 450 U.S. 785, 788, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (*per curiam*), quoting *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 385, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); *see also Immigration and Naturalization Service v. Miranda,* —— U.S. ——, 103 S.Ct. 281, 282–83, 74 L.Ed.2d 12 (1982). Applying these rules, "the courts have almost invariably denied recovery where the claimant failed to comply with proof of loss requirements found in insurance policies issued under federal programs." *Cross Queen, Inc. v. Director, FEMA,* 516 F.Supp. at 809; *accord Zeil Realty Corp. v. Director, FEMA,* 1982 Fire & Casualty Cas. 253 (S.D.N.Y.1981); *Continental Imports, Inc. v. Macy,* 510 F.Supp. 64, 66 (E.D.Pa.1981); *see also Dempsey v. Director, FEMA,* 549 F.Supp. 1334, 1337–38 (E.D.Ark.1982). Here, an express condition in Nyasco's federal crime insurance policy required the filing of a detailed, sworn proof of loss. Nyasco's failure to comply with this requirement must bar any recovery.

Nyasco's reliance on *Meister Bros., Inc. v. Macy,* 674 F.2d 1174 (7th Cir.1982), is misplaced. In *Meister* the court held that the government was estopped from denying coverage under a flood insurance policy because its adjustor had made several visits to the plaintiff's premises without ever tendering a proof of loss form and because the government "had all the information from [the adjustor's] reports that it would have had had a proof of loss been filed."

---

**8.** The statement, admitted into evidence as Plaintiff's Exhibit 8, reads in full:

7/31/79

"page 1

I am Monroe Messinger and I reside at 20 Briarcliff Drive Munsey New York. I am the President and sole officer of Nyasco Sports, Inc. We were incorporated in New York State in January of 1979. We have been at 305 East 149 St Bronx N.Y. for 15 years. We own and operate a retail, wholesale sporting goods store. Our business hours are from 9 AM to 6 PM Monday through Friday, 9 AM to 5 PM on Saturdays. We are protected by a burglar alarm system. On Friday 7/13/79 I received a phone call from the police at approximately 6 AM. They advised me that my premises had been burglarized. I arrived at the premises at approximately 9 AM and found the basement area in disarray and merchandise missing. Unknown perpetrators forcibly entered the premises by breaking through the front cellar door and proceeded to confiscate our merchandise. The police of the 40 Pct are investigating this incident under Case # 7007. I have read the above and it is true to the best of my knowledge. Witnessed by Robert Calabro,

[signed] Monroe Messinger"

674 F.2d at 1176. In addition, the government had paid part of the plaintiff's claim before objecting to further payment on the ground that a timely proof of loss had not been filed.

However, the *Meister* court itself noted that its holding was "limited to the unique circumstances" of that case. 674 F.2d at 1177. Unlike the plaintiff in *Meister*, Nyasco cannot argue that the government had all the information it would have had if a proof of loss had been filed. Surely Messinger, a practicing attorney, knew that the filing of a proof of loss was a prerequisite to recovery under his insurance policy. Nyasco does not claim that Calabro misled him in this respect. Furthermore, Nyasco's insurance policy contained a provision stating that:

> Notice to any agent or knowledge possessed by any agent ... shall not effect a waiver or a change in any part of this Policy or estop the Insurer from the asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or challenged, except by endorsement issued to form a part of this Policy, as approved by the Federal Insurance Administrator.

*See* 44 C.F.R. § 83.26(b), ¶ 12. No circumstances giving rise to a valid claim of estoppel under this provision have been shown to exist here and thus Nyasco's claim of estoppel has no merit. *See Pavone, Inc. v. Secretary of Housing and Urban Development,* 547 F.Supp. 230, 232 (D.Conn.1982) (plaintiff's claim of constructive waiver of a similar proof of loss requirement fails "[d]espite the fact that defendant's agent inspected the insured property, accepted documentation from plaintiffs, and even made an offer to settle the claim for damage to the building" (footnotes omitted)).

Accordingly, the federal defendant's motion to dismiss Nyasco's claims against it is granted and those claims are dismissed.

## II.

Both Nyasco and the private defendant are "citizens" of New York and the private defendant's liability under the insurance policy it issued to Nyasco is purely a matter of state law. Thus, the only possible basis for federal jurisdiction over Nyasco's claims against the private defendant is the doctrine of pendent jurisdiction.

In *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), the Supreme Court stated that where a plaintiff's state and federal claims "derive from a common nucleus of operative fact" and "are such that he would ordinarily be expected to try them all in one judicial proceeding, ... there is *power* in federal courts to hear the whole." (footnote omitted). However, as the Court noted, "[t]hat power need not be exercised in every case in which it is found to exist. It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right." 383 U.S. at 726, 86 S.Ct. at 1139 (footnote omitted).

While there may well be a "common nucleus of operative fact" from which both the federal and state claims made by Nyasco are derived, our decision that the claims against the federal defendant must be dismissed precludes consideration of the state claims against the private defendant. As the Second Circuit stated in *IIT v. Vencap, Ltd.,* 519 F.2d 1001, 1015 (2d Cir.1975), "[p]endent jurisdiction can be relied upon only when there is a claim conferring federal jurisdiction that will survive a motion to dismiss." *See also United Mine Workers v. Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139; *Riegel Textile Corp. v. Celanese Corp.,* 649 F.2d 894, 906 (2d Cir.1981). Resolution of the issues raised by Nyasco's claims against the private defendant is best left to a state court, which can provide "a surer-footed reading of applicable law." *United Mine Workers v. Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139.

Accordingly, Nyasco's claims against the private defendant are dismissed without prejudice.

It is So Ordered.